OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


The State of Ohio, Appellee, v. D'Ambrosio, Appellant.
[Cite as State v. D'Ambrosio (1993),     Ohio St.  3d    .]
Criminal law -- Aggravated murder conviction -- Conviction
     affirmed but cause remanded to court of appeals, when.
     (No. 90-2236 -- Submitted May 26, 1993 -- Decided
August 25, 1993.)
     Appeal from the Court of Appeals for Cuyahoga County, No.
57448.
     On Friday evening, September 23, 1988, at approximately
7:30 p.m., Anthony Klann ("victim") and Paul "Stoney" Lewis
visited a Cleveland area bar called The Saloon.  At that time,
Lewis encountered Thomas "Mike" Keenan, a former employer of
his, whereupon the two engaged in a conversation, left the bar
in Keenan's truck, and went to another bar nearby called
Coconut Joe's.  Shortly thereafter, Klann, Edward Espinoza and
defendant-appellant, Joe D'Ambrosio, arrived at Coconut Joe's.
     Lewis testified that Espinoza took the victim into the
men's restroom two or three times, and that he could hear
Espinoza yelling at the victim while he (Lewis) was seated at
the bar.  However, during his own testimony, Espinoza denied
that he argued with the victim at that time.  Lewis stayed at
Coconut Joe's until approximately 10:45 p.m. or 11:45 p.m.
     Espinoza testified that at approximately 1:30 a.m.,
Saturday, September 24, he, Keenan and defendant also left the
bar.  Espinoza and defendant went to defendant's apartment;
however, before they entered, Keenan pulled up in his truck and
asked the two to help him find Lewis so he could get back drugs
that he claimed Lewis had stolen from him.  Defendant and
Espinoza went into the defendant's apartment, whereupon
Espinoza armed himself with a baseball bat and defendant picked
up a knife.  Esponiza assumed this knife was in addition to one
that defendant usually carried.  Defendant and Espinoza joined
Keenan in his truck, and the three rode around the Coventry and
Murray Hill area looking for Lewis.
     Carolyn Rosel testified that at approximately 3:00 a.m.,
she and a friend, James Russell (a.k.a. "Foot" or "Lightfoot"),
were awakened by banging on their door.  They went to the door
and let Keenan, Espinoza and defendant inside, whereupon Keenan

asked where Lewis was.  At that time, Keenan and Espinoza told Rosel and Russell that they wanted to kill Lewis because he had "ripped Michael [Keenan] off."  After about fifteen to twenty minutes, the three left.

According to Espinoza's testimony they then resumed their search for Lewis in Keenan's truck.  Soon the three saw the victim walking next to the road they were traveling on and hailed him.  When the victim approached the truck, Keenan forced him into the backseat next to defendant.  The victim was asked where Lewis was, but he said he didn't know.  While the three interrogated the victim, Espinoza hit him on the head with a baseball bat.  The victim told them where Lewis lived, and Keenan drove to Lewis's apartment building and knocked on what he thought was Lewis's door.

Mimsel Dandec and her boyfriend, Adam Flanik, lived in the same apartment building as Lewis.  At approximately 3:30 a.m. on the date in question, Dandec and Flanik were awakened by what they described as screaming, shouting and banging outside.  Dandec testified that she heard someone yell, "I want my dope" or "my coke."  Flanik went to investigate and found Keenan pounding on another apartment door in search of Lewis.  After Flanik directed Keenan to Lewis's door, Keenan and Espinoza kicked it in while they repeatedly declared that they were going to kill Lewis.  Lewis was not in his apartment at that time, so Keenan and Espinoza got back in the truck and drove off.

Meanwhile, defendant had stayed in the truck with the victim during the incident at Lewis's apartment building.  Flanik testified that defendant had a large knife poised within inches of the victim's face.  Flanik also testified that the victim "looked like he had been crying," and "like he had been roughed up a little bit."

Russell testified that Espinoza returned to his home and asked whether Lewis had been there.  Espinoza then told Russell to "tell Stoney we got a contract out on him," and that he had the victim in the truck and that he was "dead meat."  Rosel testified that Espinoza said that they had the victim, and were "going to do him in, and drop him off."

Thereafter, according to Espinoza's testimony, Keenan drove the group to Doan's Creek and pulled his truck off the road near the bank of the creek.  Keenan got out of the truck, pulled the victim out and made him walk behind the truck.  Keenan asked the victim repeatedly where Lewis was, but the victim stated he didn't know.  Keenan told the victim to put his head back, whereupon Keenan took D'Ambrosio's large knife, cut the victim's throat and pushed him into the creek.

When the victim got up and began to run, Keenan said, "finish him off."  The defendant grabbed the knife from Keenan and pursued the victim.  Within a minute or two, Espinoza testified, the victim screamed, "please don't kill me," but defendant caught him and killed him.

Still, according to Espinoza's testimony, the trio then went to defendant's apartment where defendant changed clothes, and proceeded to Keenan's room at the Turfside Motel.  Espinoza testified that at that time Keenan "made us some story that we were supposed to keep to.  *** [O]ne was that we'd dropped off [the victim] earlier that night after we were done partying,

and he went on his way.  *** Then the other story was that we never ran into [the victim]."

At approximately 1:00 or 1:30 p.m. later that day, a jogger found the victim's corpse in Doan's Creek.

On the morning of Sunday, September 25, an autopsy was performed by the Cuyahoga County Coroner, Dr. Elizabeth K. Balraj.  The coroner testified that she found three stab wounds on the victim's chest, and that his windpipe had been perforated in two places by a throat cut.  In addition, she found some defense wounds on the victim, which are usually sustained on the hands or arms while trying to block a stabbing.  The coroner stated that all the knife wounds could have been caused by State's Exhibit 8A, but that it was possible that another knife could have been involved in the murder.

The coroner further testified that the evidence was "consistent" with the conclusion that the victim died the day before the autopsy, but that it was "possible" that the victim died forty-eight hours before the autopsy.

On October 6, 1988, defendant, Keenan and Espinoza were jointly indicted on four separate counts of (1) aggravated murder with prior calculation and design, R.C. 2903.01(A); (2) aggravated felony murder, R.C. 2903.01(B); (3) kidnapping, R.C. 2905.01; and (4) aggravated burglary of Lewis's apartment, R.C. 2911.11.

Defendant's trial commenced on February 6, 1989 before a three-judge panel.  On February 9, the trial court sealed a verdict finding defendant guilty on all counts charged in the indictment.  (The verdict was announced February 21, after the conclusion of Keenan's trial.)  On February 23, 1989, the panel found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.  Consequently, the court sentenced defendant to death on both aggravated murder counts.

Upon appeal, the court of appeals affirmed the trial court's judgments of conviction and sentence.

The cause is now before this court upon an appeal as of right.

Stephanie Tubbs Jones, Cuyahoga County Prosecuting Attorney, and Carmen M. Marino, Assistant Prosecuting Attorney, for appellee.

John F. Norton and John H. Higgans, for appellant.

A. William Sweeney, J.    Pursuant to R.C. 2929.05(A), this court is required to undertake a three-prong analysis in reviewing the instant death penalty case.  We will first consider the specific issues raised by defendant with respect to the proceedings below.  We will review all of defendant's propositions of law, even though some may be deemed to have been waived, since they were not raised below.

In his first proposition of law, defendant-appellant, Joseph D'Ambrosio, contends that one member of the three-judge panel, Judge Michael J. Corrigan, was biased, inasmuch as he had presided over the murder trial of Keenan.  At that trial, Judge Corrigan heard the testimony of Espinoza, who had entered into a plea bargain with the state whereby he would plead

guilty to noncapital offenses in exchange for his testimony against Keenan and the defendant. Defendant argues that Judge Corrigan formed an opinion of Espinoza's credibility during Keenan's trial, and that he must have believed Espinoza's earlier testimony, or else he would have found Espinoza in breach of the plea agreement and vacated his guilty pleas. Therefore, defendant submits that Judge Corrigan was not impartial and should have recused himself from defendant's trial.

We believe defendant's arguments in this regard to be without merit. First of all, the defendant never objected to Judge Corrigan's presence on the three-judge panel. Absent extraordinary circumstances, an allegation of judicial bias must be raised at the earliest available opportunity. See In re Disqualification of Pepple (1989), 47 Ohio St.3d 606, 546 N.E.2d 1298; and Tari v. State (1927), 117 Ohio St. 481, 159 N.E. 594, paragraph two of the syllabus.

However, we find that defendant's allegation of bias also fails on its merits. A judge need not recuse himself simply because he acquired knowledge of the facts during a prior proceeding. See Annotation, Disqualification from Criminal Proceeding of Trial Judge Who Earlier Presided over Disposition of Case of Coparticipant (1989), 72 A.L.R. 4th 651, 658, 661-663. Even if Judge Corrigan formed an opinion of Espinoza's veracity based on his earlier testimony at Keenan's trial, such an opinion did not disqualify the judge from this case. "[W]hat a judge learns in his judicial capacity -- whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both -- is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification." United States v. Bernstein (C.A.2, 1976), 533 F.2d 775, 785. Since "evidence presented in the trial of a prior cause *** do[es] not stem from an extrajudicial source," it creates no personal bias requiring recusal. State v. Smith (Iowa 1976), 242 N.W.2d 320, 324.

In United States v. Thirion (C.A.8, 1987), 813 F.2d 146, a federal court applied this principle to a similar case. In sentencing Thirion's codefendants, the trial judge said they were less culpable than Thirion. Thirion was later tried before the same judge and moved for recusal, citing this statement as proof of bias. On appeal, the court rejected this claim: "Judge Jones' observation came entirely from his participation at the previous trial. To accept Thirion's argument would mean that no judge could preside at a second trial on remand from an appellate court." Id. at 155. See, also, e.g., State v. Wagner (1992), 80 Ohio App.3d 88, 94, 608 N.E.2d 852, 856; United States v. Mitchell (D.D.C.1974), 377 F.Supp. 1312, 1322.

Several state courts have adopted a stricter standard, requiring recusal if the record indicates that, as a result of a prior proceeding, the judge formed an opinion as to facts at issue in a subsequent proceeding. See, e.g., People v. Gibson (1979), 90 Mich.App. 792, 282 N.W.2d 483; People v. Robinson (1974), 18 Ill.App.3d 804, 310 N.E.2d 652; In re George G. (1985), 64 Md.App. 70, 494 A.2d 247.

In our view, Judge Corrigan's conduct is acceptable even

under this stricter test.  Unlike the judges in Gibson, supra, Robinson, supra, and George G., supra, Judge Corrigan did not express an opinion.  Defendant's contention that Judge Corrigan would have abrogated the plea bargain had he not affirmatively believed Espinoza's testimony is debatable.  Judge Corrigan may have been unsure of Espinoza's truthfulness but unwilling to abrogate the plea bargain without affirmative evidence of perjury -- especially without a request by the state.  Even assuming, arguendo, that Judge Corrigan formed an opinion, that would be no guarantee that he would believe Espinoza at the later trial.  See State v. Walton (La.App. 1985), 469 So.2d 1204, 1205-1206.  Accordingly, we overrule defendant's first proposition of law.

Defendant's second, third and twelfth propositions of law arise out of the allegation of bias in the first proposition. In his second proposition of law, defendant argues that his jury waiver was not knowing and intelligent because it was made prior to the time Judge Corrigan allegedly became biased.  Once Judge Corrigan "accepted Espinoza's testimony as true," defendant claims, the trial court "had a duty to ask him if he understood the consequence of a waiver *** of a jury trial under the unique circumstances of this case."

This proposition of law lacks merit because we believe it invalidly assumes that the judge believed Espinoza's testimony in the Keenan trial.  Defendant's argument also assumes that a knowing, intelligent waiver of a jury trial can retroactively be rendered unknowing and unintelligent by postwaiver events. This court, however, has already rejected a similar proposition in State v. Davis (1992), 63 Ohio St.3d 44, 48-49, 584 N.E.2d 1192, 1196.  Cf. State v. Dickerson (1989), 45 Ohio St.3d 206, 209-210, 543 N.E.2d 1250, 1254.  Although postwaiver events might justify withdrawal of the waiver, the record reveals that defendant never tried to withdraw his waiver of his right to a jury trial.  Therefore, we overrule defendant's second proposition of law.

In his third and twelfth propositions of law, defendant alleges ineffective assistance of counsel at trial and at the court of appeals level, respectively.  In the third proposition of law, defendant contends that his trial counsel should have challenged Judge Corrigan's alleged bias, presumably by either seeking his disqualification or attempting to withdraw the jury waiver.  Upon a review of the trial record we find this argument is devoid of merit, especially in light of our reasoning under defendant's first proposition of law.

In his twelfth proposition, defendant contends that appellate counsel were ineffective because they did not argue ineffective assistance of trial counsel.  Given the fact that the issue of trial counsel ineffectiveness lacks merit, it was reasonable for appellate counsel not to raise it.  For these reasons, we find defendant's third and twelfth propositions of law to be without merit.

In his fourth proposition of law, defendant argues that the prosecutor improperly asked leading questions on direct examination.  See Evid.R. 611(C).  This proposition of law also is without merit.

A review of the trial transcript indicates that the prosecutor began Carolyn Rosel's direct examination by asking,

"I'm going to turn your attention to Saturday morning, September 24, 1988, okay? *** What were you doing at that time?" Similarly, the prosecuting attorney began questioning Russell, Dandek, Flanik, and Espinoza by directing the attention of each to the early morning of Saturday, September 24. According to defendant, these questions led the witnesses into asserting that the events testified to occurred on September 24. We disagree.

A leading question "instructs [the] witness how to answer or puts into his mouth words to be echoed back." Black's Law Dictionary (6 Ed. 1990) 888. The questions here merely directed the witnesses' attention to the topic of inquiry, which was proper. See 3 Wigmore on Evidence (Chadbourn Rev. 1970) 154, Section 769.

Defendant also complains about one question that occurred near the end of Espinoza's direct examination: "Other than the discrepancy as to whether or not the killing occurred on a Friday morning or a Saturday morning, is what you told the Court here the truth?" While this question was leading, Espinoza had already testified that the murder occurred on Saturday morning. Since the trial judge had discretion to allow leading questions on direct, see Staff Note to Evid.R. 611(C), allowing this question was not error.

In any event, the defense did not object to any of the above questions. Even if they were leading, we believe the defense waived this issue. Accordingly, we overrule defendant's fourth proposition of law.

In his fifth proposition of law, defendant contends that the trial court erroneously admitted an expert opinion that was not held with a "reasonable medical probability."

Espinoza testified that State's Exhibit 8A was the knife defendant used to kill Klann. State's Exhibit 8A is a knife with a 9 3/4-inch-long blade that is wider in the middle than at either end. At the blade's widest point, 3 3/4 inches from the tip, it is 2 1/16 inches wide. However, one of Klann's stab wounds was only 1 1/2 inches wide, even though it was 8 inches deep. Defendant questioned at trial whether State's Exhibit 8A could have made that wound. However, Dr. Balraj testified that it was "physically possible that all the wounds could have been made by" State's Exhibit 8A. Defendant asserts that the trial court should have excluded Dr. Balraj's opinion as speculative because it was stated in terms of possibility, not in terms of a reasonable medical certainty or probability.

In our view, defendant waived this issue by not objecting to it at trial. Plain error may be noticed only if such alleged error was outcome-determinative. State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. It is not clear, however, that defendant would have prevailed if Dr. Balraj had not testified that State's Exhibit 8A could have been the murder weapon. Espinoza testified that defendant usually carried a knife other than State's Exhibit 8A, and Dr. Balraj testified that "there could have been another knife involved."

While several decisions from this court indicate that speculative opinions by medical experts are inadmissible since they are based on possibilities and not probabilities, see, e.g., Shumaker v. Oliver B. Cannon & Sons, Inc. (1986), 28 Ohio

St.3d 367, 28 OBR 429, 504 N.E.2d 44, we believe that the better practice, especially in criminal cases, is to let experts testify in terms of possibility. See Giannelli, Ohio Evidence Manual (1988) 98, Section 702.05 and Jacobs, Ohio Evidence (1989) 168, Section 702-03. Evid.R. 702 allows expert opinion that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Here, Dr. Balraj's testimony helped the trier of fact to understand that, despite contrary appearances, the size of the wound was consistent with the size and shape of State's Exhibit 8A. Although Dr. Balraj's testimony does not prove that State's Exhibit 8A was the murder weapon, we believe that is an issue of sufficiency, not admissibility. Giannelli, supra. A piece of relevant evidence need not by itself prove a fact in order to be admissible. 1 McCormick on Evidence (Strong Ed. 1992) 776, Section 185.

For these reasons, we overrule defendant's fifth proposition of law.

In his sixth proposition of law, defendant asserts prosecutorial misconduct during (1) Espinoza's direct examination, (2) his own cross-examination, and (3) the guilt-phase closing argument.

With respect to the alleged prosecutorial misconduct during direct examination of Espinoza, defendant raises three instances. First, defendant complains that the prosecutor gave "unsworn testimony" -- i.e., asked a leading question on direct. This is the same issue raised in defendant's fourth proposition, which we found to be meritless.

Second, the prosecutor asked Espinoza, "Other than the discrepancy as to whether or not the killing occurred on a Friday morning or a Saturday morning, is what you told the Court here the truth?" Defendant contends that this question improperly misrepresented Espinoza's testimony as to when the victim was murdered. However, contrary to defendant's claim, the record reveals that Espinoza did testify that the murder took place on Friday night, Saturday morning.

Third, defendant contends that the question "[I]s what you told the Court here the truth?" falsely implied that Espinoza's testimony conformed to his postarrest statements; and that these statements contained the "whole truth." Thus, defendant argues that the prosecutor impliedly vouched for Espinoza's credibility. However, we believe defendant's argument rests on an unlikely interpretation of the prosecutor's question.

Assuming, arguendo, that the prosecutor erred, the defense did not object, thereby waiving this issue absent plain error. Long, supra. In our opinion, plain error does not appear here. In a bench trial, a presumption arises that the trial court "considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." State v. White (1968), 15 Ohio St. 2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70; State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

With regard to the alleged prosecutorial misconduct during his own cross-examination, defendant submits that it was improper for the prosecutor to ask him why he did not call certain witnesses to corroborate his testimony.

Defendant testified on direct examination that Keenan's

girlfriend Cindy had been following in her car while Keenan searched for Lewis (although defendant admitted on cross-examination that he had not actually seen Cindy, only the headlights of a car that Keenan said Cindy was in).  Over objection, the prosecutor asked defendant:  "[W]hy don't you have [Cindy] come down here and tell us this?"

Defendant also testified on direct that his girlfriend, Lara, was supposed to come to his apartment; that she had not arrived when he came home from Coconut Joe's; that he was worried about Lara walking alone in his neighborhood at night; and that, when Keenan came around in his truck, defendant asked him "if he could do me a favor *** and drive around a little bit and see if I can find my girlfriend."  The prosecutor asked defendant why he did not call Lara to support this testimony.  Defendant replied that he did not remember Lara's last name.  Defendant had not named either Cindy or Lara on his Crim.R. 16(C)(1)(c) witness list.  See Crim.R. 16(C)(3).

Defendant argues that these questions put the burden to prove innocence on him.  Defendant's argument lacks merit.  "[T]he fact that one of the parties fails to call a witness who has some knowledge of the matter under investigation may be commented upon."  State v. Petro (1948), 148 Ohio St.2d 473, 498, 36 O.O. 152, 162, 76 N.E.2d 355, 367; State v. Champion (1924), 109 Ohio St. 281, 289-290, 142 N.E. 141, 143-144.  "The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case."  State v. Williams (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911.

Defendant further argues that the prosecutor had no right to draw an unfavorable inference from the defense's failure to call Lara, because the prosecutor had an equal chance to call her if he thought her testimony would aid the state.  See Burke v. State (Miss. 1991), 576 So.2d 1239, 1241.  However, defendant could have easily pointed that out to the trier of fact.

Defendant argues that his failure to call Lara was irrelevant because Lara had no relevant testimony.  Again, defendant is in error.  Lara could have readily confirmed or denied defendant's story that she was supposed to come to his apartment, thus supporting or undercutting his claim that he rode with Keenan in order to find her.

Defendant also contends that the prosecutor improperly asked him on cross-examination why Flanik, Dandec and Russell would lie.  Defendant asserts that "[n]o witness is permitted to evaluate the testimony or credibility of another."  Fritz v. N.Y. Cent. RR. Co. (App. 1950), 59 Ohio Law Abs. 209, 210, 98 N.E.2d 852, 853.  Defendant's assertion is accurate.  State v. Boston (1989), 46 Ohio St.3d 108, 128-129, 545 N.E.2d 1220, 1240.  However, the prosecutor did not ask for an opinion on whether the witnesses lied.  Instead, he asked defendant to tell the court of any motive for them to lie that he knew of.  This question did not usurp the factfinder's role of evaluating credibility, nor did it, as defendant contends, "assert the prosecutor's personal opinion" of their credibility.  We believe this question simply sought information relevant to their credibility.  Moreover, defendant again failed to object.  Thus, even if his argument had merit, we believe he

waived it.

Defendant also accuses the prosecutor of "attack[ing] ***
the relationship between" him and his attorneys.  Specifically,
defendant complains about three portions of his
cross-examination:

(1)  "Q.  Your attorneys didn't even know what you were
going to say, did they?

"A.  Yes they did.

"Q.  No, they didn't, sir.  They told you to tell the
truth, didn't they?"

Defendant argues that this line of questioning "implied
*** that defense counsel had confided to the prosecutor that
[they] did not believe their client."  We believe defendant's
reading of this passage is unpersuasive.  Moreover, the law
presumes a three-judge panel capable of disregarding such a
statement unless the record affirmatively shows the panel
considered it.  Post, supra.

(2)  The prosecutor asked defendant if he had any written
statements reflecting the testimony he had given:

"A.  No, sir.  I had no need to write one.

"Q.  So *** you sat through the whole case, listened to
all the testimony, decided that you were going to conform it to
what best fit your needs; is that correct?"

Defendant argues that this question implied "that defense
counsel were not privy to defendant's testimony, because if
they had been, they would have had a written statement from
defendant."  Again, we believe defendant's interpretation of
this passage is strained at best.

(3)  Finally, the prosecutor had the following colloquy
with D'Ambrosio:

"Q.  ***  [Y]ou misjudged your position.  I'm telling you
now if you tell the truth you have a chance; do you understand?

"A.  I understand what you're saying, sir.

"Q.  A lot of people may have given you a lot of advice,
but I'm telling you now your best shot is to tell the truth.

"A.  I am telling the truth, sir.

"Q.  *** You're lying and nobody's going to believe it. ***

"A.  That's your opinion.

"Q.  You think you can outsmart everyone, don't you?"

In this regard, defendant's assertion of prosecutorial
impropriety is valid inasmuch as the prosecutor expressed his
personal opinion of defendant's credibility.  See State v.
Liberatore (1982), 69 Ohio St.2d 583, 589-590, 23 O.O.3d 489,
493, 433 N.E.2d 561, 566-567.  Many of the foregoing statements
were not even questions.  However, the court sustained an
objection to these statements, thereby showing its awareness
that this questioning was improper.

Last, with respect to the prosecutor's closing argument
during the guilt phase, defendant asserts three improper
statements, none of which was objected to at trial.

First, the prosecutor stated:  "[W]e made a deal with Mr.
Espinoza.  Mainly because we believe he's telling the truth."
Defendant argues that the prosecutor improperly gave his
opinion of Espinoza's credibility.  While defendant's assertion
is valid, the statement does not amount to plain error in a
bench trial.

Second, the prosecutor argued that Espinoza's testimony

was credible because "when he was arrested he made the statements without entertaining any idea of remaining silent, without calling an attorney, without invoking any of his constitutional rights ***."

Defendant attacks this argument on three grounds. (1) He argues that it vouched for Espinoza's credibility. We disagree. Citing facts that support credibility is not vouching. (2) Defendant argues that the prosecutor's statement "attacked the defendant's *** right to remain silent." We disagree. The prosecutor said nothing about defendant's silence. He could not, for the simple reason that defendant did not remain silent; he voluntarily spoke with Detective Allen after arrest and he also testified at trial. (3) Defendant contends that the prosecutor "ignored Espinoza's exculpatory objective in making the statements." While this is true, it is irrelevant; the prosecutor had no duty to highlight points favoring the defense.

Finally, the prosecutor said the defense could have called Cindy "if he thinks that she can substantiate anything." As noted earlier, a party may comment on the other party's failure "to call a witness who has some knowledge of the matter under investigation." Petro, supra, 148 Ohio St.2d at 498, 36 O.O. at 162, 76 N.E.2d at 367.

While most of defendant's prosecutorial misconduct claims lack merit, those with merit were waived. In addition, any errors that did occur were harmless beyond a reasonable doubt, since there is no affirmative indication that the three-judge panel considered any improper arguments. Post, supra.

For these reasons, we find defendant's sixth proposition of law to be without merit.

In his seventh and eight propositions of law, defendant contends that the state failed to present sufficient evidence on either of the murder counts he was convicted of under R.C. 2903.01(A) and (B). In this regard, when a defendant challenges the sufficiency of the state's evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

With respect to his seventh proposition of law, defendant argues that testimony about his supposed actions at Doan's Creek showed only a "spontaneous," "instantaneous" response to an "unanticipated" command, involving no prior calculation. Defendant points out that no witness testified that he threatened or expressed hostility toward the victim. Cf. State v. Jenkins (1976), 48 Ohio App. 2d 99, 102, 2 O.O.3d 73, 75, 355 N.E.2d 825, 828, where the court held that a strained relationship between victim and killer is evidence of calculation and design. Defendant also asserts that there was no evidence that he heard Keenan or Espinoza threaten the victim, and therefore that the state did not prove that he knew or shared their murderous intent. In addition, Espinoza testified that defendant was in the creek with the victim only "about a minute or two."

In State v. Cotton (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d

4, 6, 381 N.E.2d 190, 193, this court observed that "prior calculation and design" requires "a scheme designed to implement the calculated decision to kill." In addition, "[n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," but "momentary deliberation" is insufficient. Legislative Service Commission Comment to R.C. 2903.01; see State v. Pierce (1980), 64 Ohio St.2d 281, 286-287, 18 O.O.3d 466, 469, 414 N.E.2d 1038, 1042.

However, in our view the evidence submitted at trial supports a finding of prior calculation and design. Defendant held the victim in the truck at knifepoint, suggesting that he gave "studied consideration," id., 64 Ohio St.2d at 286, 18 O.O.3d at 469, 414 N.E.2d at 1042, to using the knife on the victim. Moreover, the victim knew defendant and could identify him to police, thus militating against any suggestion that this was a random encounter. Cf. Jenkins, 48 Ohio App.2d at 102-103, 2 O.O.3d at 75-76, 355 N.E.2d at 828-829.

Defendant's actions at Doan's Creek also imply prior calculation and design. According to Espinoza, defendant watched while Keenan cut the victim's throat, leaving defendant in no doubt about the meaning of Keenan's command to "finish him off." Instead of using the smaller knife he often carried with him, he took the larger one from Keenan's hand, jumped into the creek and chased Klann through the water. Defendant stabbed the victim three times while the victim pleaded, "[P]lease don't kill me." Defense wounds on Klann's arms indicate that he resisted.

Although defendant's actions took only "a minute or two," they clearly indicate his "determination to follow through on a specific course of action," which supports a finding that he previously "adopted a plan to kill." State v. Toth (1977), 52 Ohio St.2d 206, 213, 6 O.O.2d 461, 465, 371 N.E.2d 831, 836, overruled on other grounds, State v. Muscatello (1978), 55 Ohio St.2d 201, 203, 9 O.O.3d 148, 150, 378 N.E.2d 738, 740, fn.3. We therefore overrule defendant's seventh proposition of law.

In his eighth proposition of law, defendant challenges the sufficiency of evidence regarding his felony-murder conviction, which charged him with murder during a kidnapping. Defendant contends that the state failed to prove "kidnapping" as defined in R.C. 2905.01, and thus failed to prove aggravated felony murder under R.C. 2903.01(B).

Analysis of defendant's claim in this respect requires analysis and review of the indictment. The felony-murder count of the indictment (count two) does not state which subsection of R.C. 2905.01 defendant was charged with violating. However, count three of the indictment, the kidnapping count, lists the elements of kidnapping under R.C. 2905.01(A)(1) and (A)(3). Reading count two in pari materia with count three, we believe that the state had to prove the elements of kidnapping under R.C. 2905.01(A)(1) or (A)(3) in order to convict defendant on count two.

R.C. 2905.01(A) provides in pertinent part:

"No person, by force, threat, or deception *** shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"(1) To hold *** as a shield or hostage;

"***

"(3)  To terrorize, or to inflict serious physical harm on the victim or another[.]"

The evidence indicated that defendant restrained the victim by "force [or] threat."  Flanik testified that defendant held the victim at knifepoint in the back of Keenan's truck. Defendant argues that Flanik's "visual perceptions were inaccurate."  However, this court cannot retry Flanik's credibility on appeal.  State v. DeHass (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; Jackson v. Virginia, supra.  Moreover, the trial court could reasonably find that defendant had a purpose "to inflict serious physical harm on the victim," since defendant killed him under circumstances indicating prior calculation and design.

Defendant argues that the state did not prove him guilty of the mental state required by R.C. 2905.01(A)(2), and that the state also failed to prove a violation of R.C. 2905.01(B). However, defendant was not charged under those portions of the kidnapping statute.

Since we find defendant's arguments in this vein to be without merit, we overrule his eighth proposition of law.

In his ninth proposition of law, defendant contends that the felony-murder specification was defective because it alleged that "either the offenders were the principal offenders in the commission of the Aggravated Murder or, if not the principal offenders, committed the Aggravated Murder with prior calculation and design."  Defendant complains that the specification's disjunctive wording did not allow a specific finding as to whether he was a principal offender or an accomplice who acted with prior calculation and design.

However, a careful review of the trial record indicates that the panel convicted defendant of count one of the indictment, which alleged prior calculation and design with no disjunctive phrasing.  Thus, the panel made a clear, unanimous finding of prior calculation and design.  See State v. Sneed (1992), 63 Ohio St.3d 3, 10-12, 584 N.E.2d 1160, 1167-1169. Accordingly, we overrule defendant's ninth proposition of law.

In his tenth proposition of law, defendant contends that the three-judge panel improperly converted a mitigating factor -- i.e., his history of alcohol abuse -- into an aggravating circumstance.  This proposition of law also lacks merit.

In the penalty phase, defendant submitted his good military record as a mitigating factor.  The trial court panel in its sentencing opinion wrote:  "[Defendant's] military record speaks for itself[;] however, its significance is diminished when read together with D-M-2 [a psychiatric report introduced by the defense] page 2 which states:

"'He admitted to excessive consumption of alcohol while he was in the United States Army with occasional blackouts.' *** 'He described a binge pattern of drinking *** where he would drink heavily for a week and then abstain for two to three weeks ***.'"

Defendant argues that a history of alcohol abuse is a mitigating factor, and therefore cannot be used to diminish the weight of another mitigating factor.  We disagree.  A court is not "required to accept as mitigating everything offered by the

defendant and admitted."  State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.  A history of alcohol abuse may be mitigating in one case and not in another.  Thus, we believe the panel did not err in its assessment of defendant's military record and alcohol abuse.  Therefore, we overrule defendant's tenth proposition of law.

In proposition of law eleven(A), defendant argues that the felony-murder aggravating circumstance defined by R.C. 2929.04(A)(7) duplicates the elements of aggravated murder under R.C. 2903.01(B), and thus "fails to narrow the class of persons eligible for the death penalty."  This court has considered and rejected this contention before.  State v. Henderson (1988), 39 Ohio St.3d 24, 28-29, 528 N.E.2d 1237, 1242-1243.

In proposition of law eleven (B), defendant argues that the use of a felony-murder aggravating circumstance that duplicates the elements of aggravated murder "pre-conditions the jury to impose the death penalty" because it means that before the penalty phase begins, the trier of fact has already found the defendant guilty of one aggravating circumstance. This line of reasoning wrongly assumes that the trier of fact is constitutionally required to determine the existence of aggravating circumstances in the penalty phase, instead of the guilt phase.  Defendant's argument is unmeritorious. Henderson,supra, 39 Ohio St.3d at 29, 528 N.E.2d at 1243.

In proposition of law eleven (C), defendant argues that R.C. 2929.03(B) unconstitutionally biases a jury in favor of the death penalty by its prohibition against instructing the jury in the guilt phase as to the possible consequences of a guilty verdict as to the aggravating circumstances.  This issue is irrelevant in the cause sub judice since defendant had a bench trial.

Also under proposition of law eleven (C), defendant points out that, because the aggravating circumstances are determined in the guilt phase, the penalty phase focuses on mitigation. He then contends that because aggravating circumstances must be proven beyond a reasonable doubt, a jury might somehow conclude that it must recommend death unless the mitigating circumstances outweigh the aggravating factors beyond a reasonable doubt.  Similar to the preceding argument, this one is devoid of logic, and since the instant case involved a bench trial, it is irrelevant as well.

Accordingly, we overrule defendant's eleventh proposition of law in toto.

Having reviewed the various propositions of law raised by defendant, and having found none of them to be meritorious, this court would ordinarily undertake the responsibility of independently weighing the aggravating circumstances against the mitigating factors of this case, as well as a proportionality review of the death sentence.  However, the record before this court did not contain several potentially important defense mitigation exhibits which were introduced by defendant at trial during the penalty phase.  These exhibits include a presentence investigation report, a psychiatric report with supplement and defendant's high school record.  The school record was eventually located and forwarded to this

court by the prosecutor or the clerk.  After discussion of the missing documents at oral argument before this court, the prosecutor also sent to this court, counsel for defendants and all the judges sitting on this case, copies of the other missing exhibits.  Defendant has not objected to the copies, and we accept them as a supplement to the record.

R.C. 2929.05(A) provides:

"The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances *** outweigh the mitigating factors ***."

In State ex rel. Spirko v. Court of Appeals (1986), 27 Ohio St.3d 13, 16, 27 OBR 432, 434, 501 N.E.2d 625, 627, this court noted:

"R.C. 2929.05 thus places a solemn responsibility on the appellate courts to reweigh the aggravating-mitigating evidence and all other facts and evidence to determine whether death is a fitting punishment.  It is clear that a court cannot review all the facts and circumstances of a case if it does not have a complete record from which to conduct such a review."

While this court now possesses all the exhibits necessary to undertake its independent review of the death sentence, we sua sponte defer such review until the court of appeals undertakes its own independent review in light of all mitigation exhibits proffered by defendant during the penalty phase of his trial.  It is impossible to tell from the appellate court's "Supplemental Journal Entry and Opinion" whether it too had an incomplete record.  Remand to the court of appeals is necessary since defendant has a right to independent review and an explanation of its decision by the court of appeals as well as by this court.  State v. Maurer (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph four of the syllabus; State v. Gillard (1988), 40 Ohio St.3d 226, 235, 533 N.E.2d 272, 281-282.

Based on all the foregoing, we affirm the convictions of defendant, but remand the cause to the court of appeals to undertake its independent review of the death sentence in light of the complete record as supplemented, and to explain its decision.

Judgment accordingly.

Moyer, C.J., Douglas, Wright,  Resnick, Wolff and Pfeifer, JJ., concur.

William H. Wolff, Jr., J., of the Second Appellate District, sitting for F.E. Sweeney, J.