The STATE of Ohio, Appellee,

v.

EMERICK, Appellant.

[Cite as *State v. Emerick* (1995), 108 Ohio App.3d 401.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–940915, C–941048.

Decided Dec. 29, 1995.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for appellee.

*Cathy R. Cook*, for appellant.

*Per Curiam.*

These appeals stem from the judgment entered and the sentence ultimately imposed upon the finding of the court sitting without a jury that the defendant-appellant, Angela Emerick, was guilty of involuntary manslaughter and endangering children as she stood charged in the second and third counts of the indictment.

The appellant, represented by the same counsel who represented her at trial, has submitted four assignments of error:

"I.   The trial court erred to the prejudice of defendant-appellant by permitting the State's expert witnesses to testify as to the cause of death in terms not based upon a reasonable degree of medical certainty or medical probability.

"II.   The trial court erred to the prejudice of defendant-appellant by finding her guilty of voluntary [*sic*] manslaughter.

"III.   The trial court erred to the prejudice of defendant-appellant by convicting her of child endangering.

"IV.   The trial court erred to the prejudice of defendant-appellant by imposing a harsher sentence upon finding her guilty of a probation violation."

At the conclusion of the trial, one which consumed twelve calendar days, the trial judge dictated into the record his findings of fact and his analysis of the statutory and case law upon which he reached his conclusion of guilt.   The record

supports fully the factual findings, which have been abbreviated for purposes of this decision.

Angela Emerick was the natural mother of Brandon Wagner,[1] who was born in a local hospital on December 6, 1992. Angela testified that despite her lack of prenatal care, she had carried Brandon to full term. Because of certain problems occurring during delivery, Brandon remained in the hospital for ten days. After Brandon's discharge, Angela took him to the apartment in Cincinnati which she occupied with four of her other children and Donald Emerick.

On the evening of January 7, 1993, Donald Emerick, drinking heavily with a friend, one Marty Jones, in the apartment, became verbally and then physically abusive to Angela. She had joined the drinking bout and reacted to her husband's abuse by throwing him down a flight of stairs and assaulting him with pots, pans and bottles. Hours later, the pair decided to take Jones to his home located about a half-hour drive away.

Donald and Angela, with Brandon in her arms, the four other children and Jones got into Donald's automobile, the right rear window of which was broken out but replaced with pieces of cardboard and plywood. That repair was imperfect to the extent that air could enter the vehicle. The weather was described as being "very cold" with the air temperature in the range between thirty-four and forty degrees Fahrenheit.

Brandon was dressed in a diaper, an undershirt, a "sleeper," and a snowsuit, and he was further wrapped in three blankets. The heater in the automobile functioned during the trip to Jones's home and the return.

Another altercation between Donald and Angela occurred in Jones's home, and, according to Angela's testimony, Donald continued his verbal abuse on their trip home. When they arrived there, Donald and the older children left the car. Angela remained in the vehicle with Brandon because, she said, she was afraid that Donald would give her another "beating."

Once inside the home, Donald fell asleep. Although Angela testified that she had planned to obtain the keys to the car and leave with all the children, she fell asleep in the vehicle. At approximately 8:00 a.m., January 8, Donald awakened. When he could not find his wife within the house, Donald went outside and looked inside the car. His knocking on the window aroused Angela, who was asleep with her head on an armrest with Brandon in a carseat. Donald carried Brandon into the house, followed by Angela, and then discovered the baby to be dead, a fact confirmed by a member of the Cincinnati Fire Division who answered a call for

---

1. The natural father of Brandon was Donald Emerick, to whom Angela was married before Brandon's birth and at the time of his death. Donald used, among other names, that of Wagner, apparently that of a stepfather.

emergency medical assistance. It was also noted that both Donald and Angela showed signs of intoxication. Hours later, a blood-alcohol test revealed Angela's level to be .12.

The court, sitting as the trier of facts, concluded that Angela and Brandon had been in an unheated automobile with less than airtight windows for six to seven hours while Angela "slept off her intoxication." The court held that the exposure of Brandon to the risk of the effects of cold was reckless and that such conduct resulted, proximately, in the death of the infant from hypothermia.

The appellant's appeal centers upon the sufficiency and probative value of the prosecution's evidence to prove the cause of Brandon's death. Accordingly, the predicate underpinning the appellant's first assignment of error is stated to be:

"Where medical experts are not able to state a particular cause of death to a reasonable degree of medical certainty or probability, such experts should not be permitted to state an opinion as to the cause of death."

The state offered, *inter alia*, the testimony of two qualified experts to satisfy its burden to prove the cause of Brandon's death. One, Dr. Shapiro, was a physician with approximately fourteen years' experience in the practice of medicine and who, for the ten years preceding the trial *sub judice*, was the Director of the Child Abuse Program of the Cincinnati Children's Hospital Medical Center, which sees some eight thousand children a year. A second expert, Dr. Gross, possessed thirty-five years of experience, including that in both anatomic and forensic pathology as a practitioner and a professor. At the time that this expert testified, he was the Chief Deputy Coroner of Hamilton County.

The defense adduced the testimony of Dr. Bove, a physician with thirty-three years of experience in pediatrics and pathology who, at the time he testified, was the Acting Director of the Department of Pathology of the Cincinnati Children's Hospital Medical Center and who also served as a professor of pathology and pediatrics at the College of Medicine of the University of Cincinnati.

Each expert was questioned in depth upon direct examination and subjected to vigorous, probing cross-examination. Both the prosecutor and defense counsel conducted an exemplary exploration of the critical issue, *viz.*, the cause of death of Brandon. It is evident from the record that the trial court recognized the divergence of opinion between the witnesses for the prosecution and the witness for the defendant as to that pivotal question. It is clear that the court weighed the evidence in its entirety by the following excerpt taken from the summary of facts and findings:

"[T]here is a dispute among medical experts in this case; A, that Brandon did not die of natural causes; and B, that Brandon died of hypothermia caused by

defendant's exposing him to cold weather in an unheated and less than airtight motor vehicle for an extended period of time without adequate external heat."

In Dr. Shapiro's opinion, the "most probable cause of death of Brandon Wagner would have been * * * hypothermia." The following colloquy occurred with respect to Brandon's cause of death during direct examination of Dr. Gross:

"A. * * * would you be able to formulate an opinion within a reasonable degree of medical probability as to the most likely cause of death or the most— strike that—the most probable cause of death for that child under those facts?

"A. I could formulate an opinion with regards to a reasonable medical probability.

"Q. And what would that opinion be?

"A. My opinion is that the cause of death is exposure, or suffocation, or a combination of the two.

"Q. Okay. Exposure being hypothermia?

"A. That would be correct."

The defense countered the testimony of Drs. Shapiro and Gross with that of Dr. Bove, who testified that Brandon could not have been considered to be a normal, completely healthy infant. The medical problems associated with Brandon's birth, in his opinion, caused a lack of oxygen to his brain resulting in slow growth of the brain, leaving Brandon unable to respond normally to stress of the kind to which he was exposed before his death. As a result, Dr. Bove concluded that sudden infant death syndrome could not be excluded as a cause of death.

The trial court expressly relied upon *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 616 N.E.2d 909, in determining both the admissibility and the probative value of the testimony of Drs. Shapiro and Gross. In *D'Ambrosio* at 191, 616 N.E.2d at 915, Justice A. William Sweeney, writing for a unanimous court, declared:

"While several decisions from this court indicate that speculative opinions by medical experts are inadmissible since they are based on possibilities and not probabilities, see *e.g.*, *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 28 OBR 429, 504 N.E.2d 44, we believe that the better practice, especially in criminal cases, is to let experts testify in terms of possibility. See Giannelli, Ohio Evidence Manual (1988) 98, Section 702.05, and Jacobs, Ohio Evidence (1989) 168, Section 702–03. Evid.R. 702 allows expert opinion that 'will

assist the trier of fact to understand the evidence or to determine a fact in issue.' " [2]

This court has followed *D'Ambrosio* most recently in *State v. Hart* (1994), 94 Ohio App.3d 665, 641 N.E.2d 755, and in *State v. Allen* (May 25, 1994), Hamilton App. Nos. C–930159 and C–930160, unreported, 1994 WL 201828. In both cases, we held that an opinion of an expert physician is no longer inadmissible merely because it is not stated to a reasonable medical certainty, citing *D'Ambrosio.* Moreover, on September 6, 1995, the Ohio Supreme Court decided *State v. Allen* (1995), 73 Ohio St.3d 626, 653 N.E.2d 675, a capital murder case, which approved *D'Ambrosio* with respect to expert medical opinion testimony.

■ The state acknowledges that the testimony of its medical experts did not establish with certainty the cause of Brandon's death. This, however, is not fatal to the state's burden with respect to proof of this issue. As always, this issue was for the trier of the facts to decide. We hold that the testimony was admissible as a matter of law upon the authority of *State v. D'Ambrosio, supra.* The trial court, sitting as trier of facts, was free to conclude, based upon the state's experts' testimony, that the appellant proximately caused Brandon's death.

Accordingly, the first assignment of error is not well taken and is overruled.

In support of the second assignment, appellant argues that in order to prove the charge of involuntary manslaughter, the state was required to prove that she caused Brandon's death as "the proximate result of committing or attempting to commit" the offense of child endangering. She contends that even if it is assumed *arguendo* that her actions on the night of January 7 and the early hours of January 8 demonstrate guilt of child endangering, they fall short of proof beyond a reasonable doubt that she proximately caused her son's death.

■ Our review of the evidence adduced upon this lengthy and detailed trial convinces us that the trial court decided the factual issues correctly. The actions of Angela and, indeed, her then-husband were beyond a shadow of doubt reckless as a matter of law. Both had been drinking heavily, and a reasonable mind could conclude that Angela was so intoxicated that she was unable to monitor the conditions surrounding her fragile infant son during a cold night in an unheated, drafty automobile for an extended period of time. Medical experts, Drs. Shapiro and Gross, provided the evidence upon which a reasonable mind could conclude beyond a reasonable doubt that such exposure killed Brandon.

■ Accordingly, we hold that where, as here, there is substantial evidence upon which a trier of fact could conclude reasonably that all elements of an

---

2. Although appellant characterizes this observation as "dicta," we have not heretofore regarded, nor do we here believe, that characterization to be accurate.

offense charged have been proven beyond a reasonable doubt, a reviewing court will not reverse a finding of guilt. See *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132.

Therefore, the second assignment of error is overruled.

The third assignment echoes the second, and for the same reasons given in our response to the second, it must be held not to be well taken. Angela's actions resulted in serious physical harm to Brandon which caused death. She, then, committed a felony pursuant to R.C. 2919.22(E)(2). Having committed such a felony, Angela was, upon the facts of this case, guilty of involuntary manslaughter as defined in R.C. 2903.04.

In support of her fourth assignment, appellant contends that in changing her sentence from the minimum to the maximum upon proof that she had violated the terms and conditions of probation, where no new offenses had been committed, the court abused its discretion. We cannot agree.

After finding the appellant guilty of counts two and three of the indictment, the court referred her to its probation department for the return of a presentence report. After receiving that report, which included an evaluation from a psychiatric clinic, the court heard from the appellant's counsel as well as the prosecutor and reviewed letters from members of appellant's family and individuals offering to help Angela in her professed desire to rehabilitate herself, especially with respect to her addiction to alcohol. The court then merged the counts and sentenced the appellant to not less than five or more than ten years in the custody of the Ohio Department of Corrections, imposed the costs of prosecution, and then stayed the execution of that sentence so that the appellant could enter a program designed primarily to treat her alcoholism. Ultimately, she was placed on probation on November 2, 1994, on, among other restriction, the condition that she attend the First Step Program.

However, despite her entreaties and promises to the court to give her the chance to reconstruct her life, the appellant left the First Step Program, and on November 7, 1994, she was declared an absconder. She fled from Cincinnati and changed her name and appearance, but was traced to a town in New Hampshire. Subsequent information received by officers of the probation department led to the appellant's arrest at a bus station in a Cincinnati suburb on November 22, 1994.

At the hearing on the charge of violation of the terms of probation, the appellant acknowledged her failure to take advantage of the chance the court had given her, expressed sorrow and remorse, and reasserted her need for help. After extended discussion with the appellant, her counsel and the prosecution, the court terminated probation and sentenced the appellant to a period of not less

than ten or more than twenty-five years in prison, crediting her with the three hundred sixty-two days of her prior confinement. When doing so, the court, with complete justification, stated:

"I did say, you disappointed the court. You severely disappointed everybody else who tried to help you—and that's just a sad, sad state of affairs—Ms. Cook, folks around you who wanted to be of some assistance, and the probation department who really wanted to try to help you. None of that was successful. So now I feel obliged to impose the maximum sentence in this matter."

■ The record establishes that the court imposed the sentence in reliance upon *State v. McMullen* (1983), 6 Ohio St.3d 244, 6 OBR 312, 452 N.E.2d 1292, the syllabus of which states:

"A judge may, pursuant to R.C. 2951.09, impose a longer sentence after revocation of a defendant's probation without violating the defendant's constitutional rights against double jeopardy. (*United States v. DiFrancesco*, 449 U.S. 117 [101 S.Ct. 426, 66 L.Ed.2d 328], followed.)"

The undeniable and undenied facts of this case, one which was tried carefully and patiently, one in which counsel for the state and the defendant performed their sad duties in exemplary fashion, and one in which the court extended the full measure of mercy only to be disappointed, chagrined and frustrated by the intentional acts of the beneficiary of that consideration, are such that no reasonable mind upon review of this record could find any abuse of the court's discretion in meting out the sentence ultimately imposed.

Accordingly, the fourth assignment has no merit and is overruled.

The judgments of the Hamilton County Court of Common Pleas are affirmed.

*Judgments affirmed.*

HILDEBRANDT, P.J., PAINTER and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.