OPINION
Defendant-appellant Randy Stanley appeals from his conviction and sentence for Felonious Assault. Stanley argues that his trial counsel failed to provide him with constitutionally effective assistance of counsel, because he failed to object to: (1) questions by the prosecutor that were leading or otherwise improper; (2) the introduction into evidence of a photograph that was irrelevant, and that portrayed Stanley in an unfavorable light; and (3) several instances of prosecutorial misconduct during closing arguments. Stanley also asserts that the trial court abused its discretion by sentencing him to the maximum term allowable, as a result of his conviction for Felonious Assault.
We conclude that Stanley has failed to establish an ineffective assistance of counsel claim, because a review of the record demonstrates that with respect to any aspects of his counsel's performance that did not meet an objectively reasonable standard, there is no reasonable probability of a different outcome, but for defense counsel's errors. We further conclude that the trial court did not abuse its discretion by sentencing Stanley to the maximum term allowable, because the evidence in the record showed that Stanley had committed the "worst form" of Felonious Assault, and Stanley posed the greatest likelihood of recidivism. Accordingly, the judgment of the trial court isAffirmed.
 I
Immediately prior to the incident for which he was convicted, Stanley had been involved in an "on again, off again," seven-year relationship with the victim in this case, Kim Coates. As a result of their relationship, the couple had a daughter, Kayla, who was five years old at the time of the incident.
On June 12, 1998, Stanley and Coates became involved in an argument outside of their residence at the Thistlewood Apartments. Stanley ripped a wire out of Coates's car. Coates retaliated by jumping on the hood of Stanley's car and kicking in his windshield. Stanley left their residence shortly thereafter. The next day, Coates took Kayla to go bowling with her family and friends. That evening, Coates had three Long Island ice teas, which contained several liquors. Coates left Kayla with her mother, and went home to her apartments, arriving there at about midnight.
That same day, Stanley went to a party, and then a bar with some of his friends. Stanley consumed about eight to twelve beers, and about one-half of a fifth of tequila. Stanley also smoked some marijuana, and took a Vicodin. While they were at the bar, Stanley was informed by someone that Coates was seeing a man named, "Tony." Stanley began offering patrons at the bar $20 to take him to Coates's apartment. After being thrown out by the bar's owner for being "belligerent," Stanley ran out into the street to flag someone down. Stanley was stopped by two police officers, one of whom was Phillip M. Ayers, a reserve police officer with the Xenia Police Division. While Ayers could tell that Stanley had been drinking, since he was talking rapidly, Ayers did not believe that Stanley was intoxicated enough to place under arrest. Ayers agreed to take Stanley to his residence, if he "would just be quiet." At that point, Stanley became "very quiet," and Ayers took Stanley to the address Stanley gave him, which was to Jill Coates's apartment. On the way there, Ayers asked Stanley if there was "going to be a problem when we go back there," and Stanley assured him there would not be, adding, "[i]n fact, you will probably save my whole family situation by taking me home."
Ayers and Stanley arrived at the apartment at approximately 12:30 a.m. Stanley encouraged Coates to open the door by telling her that the police had brought him home. Coates opened the door, and saw the police cruiser leave, as Stanley entered the room. Once inside, Stanley demanded to know who "Tony" was. When Coates did not answer him, Stanley punched her in the face twice, causing her to lose consciousness.
Coates's neighbors heard the fight, and contacted the Xenia Police Division, which dispatched Officer Alonzo Wilson to investigate a disturbance at the Thistlewood Apartments. After Wilson arrived, his attention was drawn to Coates's apartment, from which he heard an angry male voice saying "you did this to me again, you're not going to keep doing this." Wilson heard a female say in a "distressed" voice, "let me up, let me up." After radioing the exact address to the police dispatcher, Wilson heard the angry male voice shouting, "I'm going to kill your ass this time, bitch." Wilson radioed his back-up to "step on it." Wilson then heard several loud thumps, as if someone was getting punched.
Deciding that he could wait no longer for his back-up, Wilson entered the apartment, which was unlocked, and announced, "Police Department." Stanley emerged from the bedroom, telling the officer that they did not need the police, and ordering the officer to leave. Then, Coates came out of the bedroom, naked, and said, "help me." Coates "had blood all over," including on her face, which also had a "knot" on it. Wilson thought that Coates looked as if she was in a semi-conscious state. Wilson grabbed Stanley's arm, took him outside on the front porch and handcuffed him. Not wanting to leave Coates alone, Wilson brought Stanley back inside. Wilson's back-up, Officer Christopher Stutes arrived. Stutes saw Coates, lying on the couch, "moaning and groaning," with her head appearing to be "lopsided." Stutes noticed that Coates's eyes were black; that she had several bruises and bite marks; and seemed "really lethargic, really seemed in and out of it."
Wilson and Stutes brought Stanley out to the police cruiser, and returned to the apartment. Stutes watched from the apartment window as Stanley began banging his head on the glass partition between the front and back seats of the cruiser. Stutes went over to Stanley to tell him to stop banging his head. When Stutes got there, Stanley pointed to the injuries on his head, which he had just inflicted upon himself, and accused Coates of causing them. Stutes later heard Stanley telling paramedics that he and Coates had gotten into an altercation and that "he hit her with a left and right and choked her out."
Coates was taken to Greene County Memorial Hospital where she was treated by Dr. David W. Carter, and Angela Lee Stils, an Emergency Room Technician and a paramedic. Carter and Stils testified that Coates had at least 41 different injuries on her, including bruises, cuts, scrapes, and bite marks. Stils later testified that in her seven years of experience working in emergency services, she had not seen a person with injuries as severe as Coates's, without the person having been "involved in a motor vehicle accident or some other trauma." Stanley, himself, was later brought to the hospital as a patient. Stanley told Stils that he had struck Coates in self-defense, and that he had hurt his thumb. Stils heard Stanley continually tell others that he was a "woman beater."
Stanley's probation officer, Susan Johnson was contacted the night of the incident. Upon her arrival at the hospital, she saw Stanley seated in the back of a police cruiser. When Johnson asked Stanley what was going on, he told her that "he gave her [Coates] a left, he gave her a right, then he tried to choke her out." Johnson talked with Stanley later that night at the Greene County Jail, where she told him that she had just seen Coates, that he had "beaten the crap out of her," and that Coates "looked like an alien."
Stanley was indicted on charges of Attempted Murder in violation of R.C. 2923.02(A) and 2903.02(A), and Felonious Assault, in violation of R.C. 2903.11(A)(1). A three-day jury trial was held on these charges in February, 1999. The State presented the testimony of Coates, Wilson, Stutes, Carter, Stills, and Johnson, who testified to the facts related above. Stanley, testifying in his own defense, denied that he had attempted to kill Coates.
At the close of evidence, Stanley's counsel asked for and received a jury instruction on the lesser-included offense of Domestic Violence, contained in R.C. 2919.25(A). The jury acquitted Stanley on the charge of Attempted Murder, but convicted him on the charge of Felonious Assault. The trial court sentenced Stanley to eight years imprisonment, the maximum term allowed for a conviction on a Felonious Assault charge.
Stanley appeals from his conviction and sentence.
 II
Stanley's First Assignment of Error states:
 APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL SINCE HIS TRIAL COUNSEL FAILED TO OBJECT TO LEADING AND IMPROPER QUESTIONS, FAILED TO OBJECT TO CUMULATIVE AND PREJUDICIAL EXHIBITS (PHOTOGRAPHS) AND FAILED TO OBJECT TO NAME-CALLING AND OTHER PROSECUTORIAL MISCONDUCT.
In order to prevail on an ineffective assistance of counsel claim, a convicted defendant must show that his counsel's performance was deficient, and that his defense was prejudiced thereby. Strickland v. Washington (1984), 466 U.S. 668, 687. In order to demonstrate that his counsel's performance was deficient, the convicted defendant must establish that his "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id.
This requires the defendant to show that his "counsel's representation fell below an objective standard of reasonableness." Id. at 688. In order to demonstrate that his defense was prejudiced by his counsel's deficient performance, the defendant must establish that his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. This requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
First, Stanley argues that his trial counsel was ineffective for failing to object to the prosecution's "serial use" of leading questions, which Stanley contends, "amounted to the prosecutor virtually testifying at the trial." We disagree.
"[A] leading question `is one that suggest to the witness the answer desired by the examiner. * * * The whole issue is whether an ordinary man would get the impression that the questioner desired one answer rather than the other.'" 1 Gianelli SnyderEvidence (1996) 562, Section 611.11, citing 1 McCormick (4th Ed. 1992) Evidence 17-18, Section 6. See, also State v. D'Ambrosio
(1993), 67 Ohio St.3d 185, 190 (leading question instructs witness how to answer or puts words into his mouth to be echoed back). "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." Evid.R. 611(C). However, the trial court has broad discretion in deciding whether to allow the use of leading questions in order to develop a witness's testimony. State v. Lewis (1982), 4 Ohio App.3d 275,278. Moreover, where a question merely directs the witness's attention to the topic of inquiry, the question is not improper. D'Ambrosio, supra, and State v. Brown (1996),112 Ohio App.3d 583, 599.
Here, most of the questions that Stanley alleges were leading, either were not, or were used merely to summarize previous testimony, or to direct a witness's attention to the topic of inquiry. For example, the prosecutor did not lead Dr. Carter into testifying that Coates's injuries were severe. Instead, the prosecutor laid a foundation showing that Carter had observed trauma on many occasions, some of which was severe, and some of which was minor. The prosecutor then asked Carter to classify Coates's injuries in light of that experience, and he responded by saying, "[i]n relation to other assault type injuries this was on the severe end of that." The question did not attempt to suggest an answer, and, therefore, was not leading.
On another occasion, the prosecutor referred to Exhibit 18, which showed Coates with bruises, scratches, and bite marks on her chest. The prosecutor used those words to summarize the content of the photograph, and asked Carter: (1) if he recognized that picture from his examination; and (2) to describe what the picture indicated, with respect to Coates's injuries. Stanley argues that instead of summarizing what the picture showed, the prosecutor should have asked Carter to describe what it showed. However, the prosecutor was merely directing Carter's attention to the topic of inquiry.
Stanley also asserts that the prosecutor asked Carter to testify that Stanley used "some sort of object (weapon)" to beat Coates. However, the prosecutor's purpose in asking this question was to follow up on Carter's testimony that the cuts and bruise behind Coates's left ear was caused by "blunt soft tissue trauma to that area, and more than likely there was an edge or a raised area that was struck there." When the prosecutor asked if the injury could be caused by "some type of instrument," Carter responded, "Edge of something." Stanley's defense suffered no prejudice as a result of his attorney's failure to object to this question.
Referring to the photograph in Exhibit 8, the prosecutor asked Carter if the injury depicted in that photograph was "consistent with choking," and Carter responded that it was. Even if this were deemed a leading question, defense counsel's failure to object to it did not rise to the level of constitutionally ineffective assistance. At least two witnesses testified that they heard Stanley say that he tried "to choke her [Coates] out." While Stanley denied trying to strangle Coates, he admitted that he had his hands on her throat and neck on two occasions. If the question was, in fact, leading, then the prosecutor, upon objection, could have simply rephrased his question to properly elicit the response he received. Either defense counsel's failure to object to the questions asked of Carter did not constitute an objectively unreasonable performance, or, at the very least, there was no reasonable probability that a different result would have occurred if defense counsel had objected to the questions.
Stanley also argues that the prosecutor improperly sought opinion testimony from paramedic Stils on the extent of Coates's injuries, without laying a proper foundation. However, Stils testified that she had been doing emergency work for seven years. Like Carter, Stils was qualified to express her opinion concerning the severity of Coates's injuries. Moreover, the photographs of Coates taken after she was beaten, left no doubt that her injuries were severe. In fact, Stanley, himself, admitted that Coates's eye injury was "severe." Stanley also argues that the prosecutor improperly led Stils when he asked her, "[i]s that why she was given a pain shot[,] [b]ecause of the acute pain?" However, Stanley's defense was not prejudiced as a result of this question.
Second, Stanley asserts that his trial counsel was ineffective for failing to object to the introduction of Exhibit 45, which was a photograph of him taken shortly after he had been arrested for the assault. Stanley asserts that the photograph portrays him in "an unflattering or belligerent posture," and with a "smirky (sic) visage." Stanley argues that the photograph had no relevance to the issues in this case and was introduced for the sole purpose of presenting Stanley as "a sarcastic, contemptuous individual who would be a candidate to commit a crime." We disagree.
Exhibit 45 is essentially a "mug shot" taken of Stanley shortly after his arrest. In the photograph, Stanley is handcuffed and has a board hung over his neck, indicating his name, date of birth, and the date of the incident. Undoubtedly, a mug shot of someone is inherently "unflattering," but the jury was well aware that Stanley had been arrested. Furthermore, while the photograph shows Stanley tilting his head to one side, it does not show Stanley with a "smirky" visage, or otherwise portray him as a "sarcastic, contemptuous individual" who would have been likely to commit the crime with which he was accused. Defense counsel's failure to object to this photograph did not constitute ineffective assistance.
By stating in his First Assignment of Error, that counsel "failed to object to cumulative and prejudicial exhibits (photographs) * * *," Stanley appears to be challenging his trial counsel's failure to object to at least some of the photographs that were admitted at the State's request for the purpose of demonstrating the extent of Coates's injuries, claiming that the photographs were cumulative. In reviewing the admissibility of photographs, the relevant inquiry is whether the photographs are relevant to proving a material issue in the case, and whether their probative value outweighs their prejudicial impact. Statev. Maurer (1984), 15 Ohio St.3d 239. Here, the photographs admitted into evidence depicted the extent and seriousness of Coates's injuries, and were therefore relevant to proving both the Attempted Murder and Felonious Assault charges.
Third, Stanley faults his trial counsel for not objecting to several instances of prosecutorial misconduct during closing argument. First, Stanley argues that the prosecutor called him "a monster" during closing arguments. However, when the prosecutor's comments are examined in context, it is apparent that the prosecutor was not calling Stanley a monster, as Stanley insists, but was, instead, merely trying to argue that Coates was credible:
 She [Coates] could easily exaggerate and make the Defendant look like a monster, a monster based upon those pictures, and it would be easy to conclude. Anyone who would commit those acts is a monster, is a monster. She could do that, but she didn't. She told you the truth and she was honest about it.
While the prosecutor did not express himself adroitly, he actually suggested that Coates would have been exaggerating if she had
called Stanley a monster.
Stanley further asserts that the prosecutor engaged in misconduct by referring to domestic violence as a "minor, minor" offense. However, the prosecutor was not referring to domestic violence as a minor offense, but, instead, was arguing that Coates's injuries were severe and not minor, and, therefore, a conviction on the lesser included offense of domestic violence would be inappropriate in light of this fact.
The prosecutor did make some comments during his closing argument that were troubling. The prosecutor's repeatedly calling Stanley a "coward," during his closing argument was improper. Undoubtedly, Stanley's actions in assaulting Coates were cowardly, and it would have been impossible for his defense counsel to argue otherwise and still maintain credibility with the jury. Nevertheless, the prosecutor's decision to repeatedly call Stanley a coward during his closing argument was designed to inflame the prejudice of the jurors, and, therefore, Stanley's defense counsel should have objected to them.
Nevertheless, the evidence presented in this case demonstrated overwhelmingly that Stanley inflicted serious
physical harm on Coates, not just physical harm, and, therefore, was guilty of felonious assault, rather than simply domestic violence. Compare R.C. 2903.11(A)(1) ("No person shall knowingly: * * * [c]ause serious physical harm to another * * *"), to R.C.2919.25(A) ("No person shall knowingly cause or attempt to cause physical harm to a family or household member"). Thus, there is no reasonable probability of a different outcome in this case, if Stanley's defense counsel had objected to the prosecutor's improper comments. Furthermore, the jury's acquittal of Stanley on the Attempted Murder charge suggests that it was not inflamed as a result of the prosecutor's closing argument.
Stanley's First Assignment of Error is overruled.
 III
Stanley's Second Assignment of Error states:
 THE TRIAL COURT ABUSED ITS DISCRETION AND MISAPPLIED STATUTORY CRITERIA IN SENTENCING APPELLANT TO THE MAXIMUM SENTENCE PROVIDED BY LAW.
Stanley faults the trial court for failing to consider the sentencing factors listed in R.C. 2929.13(B), which he "did not violate," and for failing to consider any of the mitigating factors listed in R.C. 2929.12. Thus, Stanley asserts the trial court abused its discretion in sentencing him to the maximum sentence allowed by law. We disagree.
Pursuant to R.C. 2929.14(C), a court may impose the maximum sentence upon, among others, an offender who commits the worst form of the offense, or upon an offender who poses the greatest likelihood of committing future crimes. Here, the trial court found that Stanley had committed the worst form of the offense, and that he posed the greatest likelihood of committing future crimes. The evidence in the record supported both findings. Stanley administered a vicious beating to Coates, inflicting at least 41 separate injuries on her. If Officer Wilson had not intervened when he had, Stanley may have killed her. Furthermore, Stanley had already served a prison sentence for one felony; was under community control at the time of his current offense; and had a "two or three page criminal record," containing traffic violations, assaults, and convictions for driving under the influence. According to the trial court, Stanley has used his voluntary intoxication from drugs and alcohol as an excuse in his previous convictions. Stanley had been ordered not to go in bars, consume alcoholic beverages, or use drugs, as a condition of his "post-release control" on his previous felony. Nevertheless, Stanley breached each of those conditions immediately prior to his assault on Coates, which he blamed on his drug and alcohol abuse.
The trial court was not required to discuss the criteria that Stanley did not offend, e.g., that he was not a public office holder, and did not commit the offense for hire. We also reject Stanley's argument that the trial court failed to consider the possibility that Coates had provoked Stanley, since Stanley believed that Coates was having an affair with a man named "Tony," Coates had refused to answer his questions about "Tony," and Coates was, allegedly, starting to break things around the apartment before Stanley assaulted her. The trial court was entitled to find that Stanley's testimony on these matters was not credible, and that, even if it was, these acts did not provide sufficient provocation to serve as mitigating factors.
Stanley's Second Assignment of Error is overruled.
 IV
Both of Stanley's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF and YOUNG, JJ., concur.
Copies mailed to:
Robert Hendrix
J. Allen Wilmes
Hon. M. David Reid