OPINION
This is an appeal by defendant-appellant, Janie T. Martin, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of aggravated murder.
On February 25, 2000, defendant was indicted on one count of aggravated murder, in violation of R.C. 2903.01. The indictment arose out of an incident occurring on February 12, 2000, in which Augustus Shivers was stabbed at an apartment on Cleveland Avenue. The case came to trial before a jury beginning on June 21, 2000.
The state's first witness was "Prince" Davis, who rented the apartment where the victim was stabbed. Davis gave the following testimony regarding the incident. On February 12, 2000, a group of individuals, including Davis, Shivers, Leron Peoples, Debow Lemmon and defendant gathered at Davis' apartment to drink beer and socialize. Defendant arrived at the apartment shortly before noon. She left the apartment at approximately 2:00 p.m., but returned later in the afternoon.
That afternoon, defendant and Shivers "had some words." (Tr. at 53.) Defendant and Shivers began arguing in the living room area, and Davis heard defendant state that, "she didn't owe Gus any money." (Tr. at 54.) According to Davis, the argument between defendant and Shivers escalated, with "both of them bumping up against one another." (Tr. at 56.) Davis told Shivers and defendant to "settle down * * * and they stopped for a minute, and the next thing I know Jazzie [defendant] spit on him." (Tr. at 56.)
Shivers and defendant then went into the bedroom and closed the door. Davis subsequently heard a crashing sound; he went into the bedroom and observed that a window had been broken. Defendant told Davis that she had broken the window. Davis again told them to settle down, and he left the bedroom.
A short time later, defendant came out of the bedroom and gave Davis some money to pay for the window. Davis testified that, after defendant came out of the bedroom, "my recollection is she must have went into the kitchen, and she walked back into the [bed]room because the door was partially opened." (Tr. at 57.) During direct examination, Davis was shown a diagram of the apartment. In reference to the diagram, Davis indicated that, after defendant broke the window and came out of the bedroom, "she went around this way into the kitchen and came back and went back in [to the bedroom]." (Tr. at 75.) Lemmon was also in the bedroom at this time with defendant and Shivers. Approximately forty-five seconds later, defendant came back out of the bedroom. Davis testified that defendant had a knife and a liquor bottle in her hands when she exited the bedroom. Davis recognized the knife as a steak knife from his kitchen that he kept "either in the cupboard or in the drawers underneath." (Tr. at 75.)
When defendant exited the room, she appeared "angry" but did not say anything to anyone. (Tr. at 68.) Davis heard Lemmon tell defendant "to get out or something." (Tr. at 68.) Davis went into the bedroom and noticed that Shivers was lying on the bathroom floor. At first, Davis did not think that Shivers was seriously injured, but when Davis attempted to help him up he realized that Shivers was bleeding. Davis then ran out into the hallway to seek assistance.
Franklin County Sheriff's Deputy Carl Hickey was on duty on February 12, 2000, and he was dispatched to investigate a reported stabbing at 3668 Cleveland Avenue. Deputy Hickey interviewed Prince Davis on that date at police headquarters. Deputy Hickey then drove to Riverside Hospital to assist with the victim, but when the officer arrived at the hospital the victim had already been pronounced dead. At the hospital, Deputy Hickey collected various items from the trauma room belonging to the victim. One of the items collected by the deputy was a glass tube that the officer described as a "crack pipe." (Tr. at 125.) Another item the deputy recovered was a folded mirror containing a razor blade.
Dr. Keith Norton, a deputy coroner and forensic pathologist with the Franklin Count Coroner's Office, conducted an autopsy of the victim. Dr. Norton noted that the victim had an incision in the area of the left collarbone, one-half inch in length and four and one half inches in depth. The direction of the wound "went downward and from front to back." (Tr. at 177-178.) According to Dr. Norton, the incision wound entered above the collarbone, struck the first rib and then "went between the first and second rib to go into the left chest cavity and hit the left lung, went through the left lung and into the aorta." (Tr. at 174.) Dr. Norton opined that the wound caused the victim's death. An analysis of the victim's blood indicated an alcohol level of .22 grams percent, and cocaine and marijuana were also present in the victim's blood.
Franklin County Sheriff's Detective Robert McDonald investigated the stabbing incident and defendant subsequently became a suspect. A warrant was issued for defendant's arrest, but she turned herself in on February 17, 2000.
Following defendant's arrest, Detective McDonald conducted an interview with defendant. The interview was recorded on tape and played for the jury at trial. During the interview, defendant indicated that prior to the stabbing, she and the victim had an argument over money the victim believed he was owed, as well as the fact that the victim wanted to have sex with a woman named Bridgett. Defendant stated that the victim hit her in the face. When the detective asked defendant what happened next, she responded, "[b]ehind every action, there is a reaction." (Tr. at 235.) Defendant told the detective that there was a knife in the corner of the room, and that she went over and picked it up. Defendant stated that she "wasn't mad at him. I was just pissed that he put his hands on me." (Tr. at 237.) Defendant stated that she had been drinking that day.
Defendant told the detective that she "didn't want to hurt him." (Tr. at 241.) When asked by the detective why she stabbed him, defendant again responded, "[b]ecause every action there is a reaction. If you hit me, I'm going to hit you back." (Tr. at 242.) Defendant related that, "I was getting ready to go out the door and I seen that [the knife]." (Tr. at 247.) She further stated that:
 * * * [T]hey were arguing about him putting his hands on me and I think that's when Prince got up and said he hit her or somebody just said something about hitting me, and I guess that's when everybody started coming towards the bedroom and I seen the knife, picked the knife up, and I just kept saying, you hit me, you actually put your hands on me. [Tr. at 250.]
Defendant also indicated during the interview that, when she stabbed the victim, "[Lemmon] was standing in between us," and that it "appeared like he was going to keep on trying to come toward me." (Tr. at 251.)
Defendant testified on her own behalf, and gave the following testimony regarding the events of February 12, 2000. According to defendant, at the time of the incident, she resided at 3668 Cleveland Avenue with Prince Davis. On the morning of February 12, 2000, defendant arrived at the apartment on Cleveland Avenue at approximately 8:00 a.m., having spent the previous evening at another location. Defendant ate a steak for breakfast in the bedroom with a steak knife.
Later that morning, Shivers came over to the apartment. Defendant was acquainted with Shivers, having first met him the previous year. Davis and a neighbor, Leron Peoples, were also at the apartment. Davis, Peoples and Shivers wanted beer, and Shivers also wanted crack cocaine. Defendant left the apartment, obtained some cocaine and then returned to the apartment. All of the individuals, including defendant, shared the cocaine. According to defendant, Shivers made a sexual advance, asking if he could "get with me, and I told him no." (Tr. at 310.)
Defendant subsequently left the apartment to get more cocaine. When she returned, two other individuals, Deshawn "Debow" Lemmon and a woman named Bridgett were at the apartment. Defendant described Bridgett as "a white girl *** in our neighborhood that smokes crack, and she is a known prostitute." (Tr. at 311.) Shivers asked defendant to talk to Bridgett "about hooking him up." (Tr. at 311.) Defendant spoke to Bridgett in the bathroom, and Bridgett told defendant "she was on her period and she could not have sex." (Tr. at 312.) Defendant spoke with Shivers, who said, "that is all right because all I wanted is some head anyway." (Tr. at 312.) Defendant related the information to Bridgett, who said that she was "okay with it, but she said she needed to have some money, too, because she needed to buy beer and get * * * something to eat." (Tr. at 312.)
Defendant later went to a store and then returned to the apartment after 4:00 p.m. At the apartment, the other individuals were "standing around, drinking, smoking crack, and just listening to music." (Tr. at 316.) When defendant arrived, Bridgett was upset about something.
Later, defendant began gathering up some of her items from the bedroom, and during this time Bridgett and Shivers were arguing. Defendant told Bridgett to "get out of my face." (Tr. at 321.) Bridgett walked out of the bedroom, leaving defendant and Shivers in the room. Shivers then "made the statement that Bridgett didn't live up to her end of the bargain." (Tr. at 321.) Shivers "wanted me to pay him money or me give him head." (Tr. at 321-322.)
Defendant told Shivers that she was not going to give him any money. According to defendant, Shivers stated, "well, somebody is going to give me something." (Tr. at 322.) Shivers then "started saying, like, bitch, don't let me fuck you up, Jazzie. Please, don't make me hurt you." (Tr. at 323.) Defendant testified that Shivers "smacked" her in the face. Defendant related that the inside of her mouth was bleeding, and that she broke the bedroom window because Shivers was blocking her from attempting to go into the bathroom. Lemmon heard the sound and came into the bedroom. Lemmon was "trying to keep Gus away from me." (Tr. at 328.) Defendant denied that she came out of the bedroom and gave Davis any money for the broken window.
Lemmon then walked out of the bedroom but he returned a short time later and stood between Shivers and defendant. Defendant testified that she eventually saw the knife on the floor that she had used earlier that morning to eat the steak. Defendant picked up the knife and put it behind her back.
Defendant testified that she attempted to go toward the bedroom door but Shivers "went toward the door again and was, like, stop that bitch, you are not going nowhere." (Tr. at 335.) According to defendant, Shivers "was trying to get around [Lemmon] to get to me, and [Lemmon] wouldn't let him." (Tr. at 337.) Defendant testified that Shivers "kind of lunged toward me," and he said, "I'm about to kill this bitch." (Tr. at 337.) Defendant then stabbed Shivers and she ran out the bedroom door. She hurried out of the apartment because she was afraid Shivers was going to come after her. Five days after the incident, on February 17, 2000, defendant turned herself into the police.
On cross-examination, defendant acknowledged that, during the interview with Detective McDonald, she did not tell him that she broke the window in the apartment because she could not get out of the room; rather, the only reason she gave the detective was that she was angry. Defendant also acknowledged that she never indicated to the detective that Shivers came toward her as she stabbed him. Defendant denied that she reached over Lemmon to stab Shivers.
Following the presentation of evidence, the trial court gave the jury instructions on the elements of both aggravated murder and murder. The jury returned a verdict finding defendant guilty of aggravated murder. The trial court sentenced defendant by judgment entry filed on June 29, 2000.
On appeal, defendant sets forth the following single assignment of error for review:
 JANIE MARTIN'S CONVICTION FOR AGGRAVATED MURDER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Under defendant's single assignment of error, defendant argues that her conviction for aggravated murder was against the manifest weight of the evidence. Although defendant's assignment of error sets forth a manifest weight claim, defendant's argument in support also appears to challenge the sufficiency of the evidence. Specifically, defendant contends that the evidence was insufficient for a trier of fact to find the elements of prior calculation and design.
For purposes of review, we will consider both the sufficiency and weight of the evidence supporting the conviction. In determining the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. However, "[u]nlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented." State v. Maydillard (Nov. 1, 1999), Warren App. No. CA99-06-060, unreported. Id. When reviewing the manifest weight of the evidence, an appellate court sits as a thirteenth juror; the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of all witnesses and determines whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. Id., citing State v. Martin (1983),20 Ohio App.3d 172, 175. Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Maydillard, supra.
R.C. 2903.01 sets forth the offense of aggravated murder. R.C.2903.01(A) states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." As noted above, defendant's assignment of error challenges the evidence admitted in support of the elements of prior calculation and design.
Although the term "prior calculation and design" has not been statutorily defined, "it is generally understood to encompass the calculated decision to kill." State v. Jackson (Jan. 20, 2000), Cuyahoga App. No. 75354, unreported, citing State v. Robbins (1979),58 Ohio St.2d 74, paragraph one of the syllabus. It has been held that "neither the amount of care nor the length of time the offender takes to ponder the act are critical factors in themselves in determining prior calculation and design." Jackson, supra, citing State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 196. However, "mere momentary deliberation is insufficient to constitute prior calculation and design to kill." State v. Norman (Dec. 23, 1999), Franklin App. No. 99AP-398, unreported. Further, the Ohio Supreme Court "has recognized it is impossible to formulate a bright-line test which can readily distinguish the presence of prior calculation and design from its absence each case must turn on the specific facts and evidence introduced during the trial." Jackson, supra.
Defendant argues that the facts indicate that her actions in picking up the knife were defensive in nature, taken out of fear for her safety. Defendant maintains that there was little or no time for prior calculation and design, and no real evidence from which a jury could reasonably find those elements to exist.
We will initially consider the sufficiency of the evidence, and the facts construed most strongly in favor of the state indicate the following. On the date of the incident, defendant was at an apartment with a group of individuals who were drinking alcohol and using crack cocaine. Later that afternoon, defendant and Shivers became engaged in an argument over money and/or a failed attempt by defendant to procure the services of a prostitute for Shivers. At one point during the argument, defendant spit on Shivers. Later, defendant and Shivers were arguing in the bedroom, and Davis, who was in the living area, heard a crashing sound; he went into the bedroom and defendant indicated that she had broken the bedroom window. Davis went back to the living room and, a short time later, defendant came out of the bedroom and gave Davis money for the broken window. At that time, according to Davis, defendant went to the kitchen area where Davis kept his kitchen knives. Defendant then walked back into the bedroom. Approximately forty-five seconds later, defendant emerged from the bedroom with a liquor bottle and a knife in her hands; defendant did not say anything to anybody and she quickly left the apartment. The fatal stab wound to the victim, four and one-half inches in depth, was made in a downward direction, causing injury to the victim's left lung and aorta.
A police detective subsequently interviewed defendant regarding the incident. Defendant acknowledged that she stabbed Shivers. When asked why she stabbed him, defendant responded, for "every action there is a reaction. If you hit me, I'm going to hit you back." (Tr. at 242.) Defendant acknowledged to the detective that another individual, Lemmon, was standing between her and Shivers when she stabbed him. Defendant told the detective that, before she stabbed Shivers, "I just kept saying, you hit me, you actually put your hands on me." (Tr. at 250.) Contrary to defendant's testimony at trial, defendant did not, during the interview, indicate to the detective that Shivers came toward her as she stabbed him, nor did she indicate that she feared for her safety.
Upon review, the record contains sufficient evidence for the trier of fact to have found all of the elements of aggravated murder, including evidence to prove, beyond a reasonable doubt, that defendant acted with prior calculation and design. Here, there was evidence that defendant, following an argument with Shivers in the bedroom, came out of the bedroom to give Davis money for a broken window. Davis' testimony undermined defendant's contention that she broke the window because the victim, after striking her, blocked her from leaving the bedroom area. Presumably, defendant could have ended the confrontation at the time she came out of the bedroom. However, after going to the kitchen area, defendant returned to the bedroom and, a short time later, emerged from the room having stabbed Shivers. The inference that defendant carried a knife from the kitchen to the bedroom, as well as evidence regarding the depth, location and downward direction of the stab wound, and defendant's statements to the detective indicating that her conduct was retributive rather than based on fear, constituted evidence of prior calculation and design.
In Norman, supra, this court found upheld a jury's finding of prior calculation and design where the appellant, following a confrontation with the victim in the appellant's house, went upstairs to retrieve a gun. This court held that "[a]ppellant's withdrawal from the confrontation to obtain a weapon was a sufficient lapse of time and provided sufficient opportunity to allow appellant to form a plan to carry out the purpose to kill." Id. See, also, State v. Robbins (1979),58 Ohio St.2d 74, 79 (following altercation with victim in hallway, defendant's act of entering his apartment, obtaining weapon and returning to hallway to stab victim "instants later" was sufficient evidence to support jury's finding of prior calculation and design).
Similarly, in the instant case, there was sufficient evidence that, following the quarrel, defendant retrieved a knife and made a deliberate decision to stab the victim while another individual was standing between the defendant and victim. Further, despite defendant's contention that there was little or no time for prior calculation or design, "neither the time taken pondering the crime nor the care taken in completing it are determinative of `prior calculation and design' so long as more than momentary deliberation can be established." State v. Gerish (Apr. 22, 1999), Mahoning App. No. 92 CA 85, unreported. Finally, we note that, even accepting defendant's version that the knife had been in the bedroom prior to the argument, the trier of fact could have still determined that defendant acted with prior calculation and design. Specifically, evidence that defendant left the bedroom to give money to Davis for the broken window indicates a "cooling off" period and, as noted above, undermines defendant's contention that the victim was preventing her from leaving the bedroom. There was no evidence that defendant was compelled to go back into the room, but having deliberately chosen to do so, she subsequently stabbed the victim with a knife she presumably knew was available. Thus, even assuming that the knife was already in the bedroom, there was evidence that defendant did not act on the spur of the moment; rather, the evidence indicated sufficient time and opportunity for defendant to have planned her actions. Based upon the record in this case, defendant's conviction was not against the sufficiency of the evidence.
Further, in considering the manifest weight of the evidence, we conclude that the jury did not lose its way in resolving credibility determinations, nor did its verdict create a manifest miscarriage of justice. In general, the determination as to credibility of witnesses is within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. In the present case, defendant's statements to the detective and her testimony at trial regarding the circumstances surrounding the stabbing were inconsistent. The jury was not required to accept defendant's testimony at trial that she was acting out of fear for her safety, and the jury obviously rejected defendant's claim of self-defense. Moreover, there was conflicting testimony between the state's witness, Davis, and defendant, as to whether defendant emerged from the bedroom to give Davis money after defendant broke the window, and whether defendant subsequently went to the kitchen before returning to the bedroom. The jury was in the best position to resolve these credibility issues, and we decline to substitute our judgment for that of the trier of fact. Accordingly, we conclude that the verdict was not against the manifest weight of the evidence.
Based upon the foregoing, defendant's single assignment of error is overruled and the judgment of the trial court is hereby affirmed.
BRYANT, P.J., and LAZARUS, J., concur.