OPINION
Defendant-appellant Phillip Lawrence appeals from his conviction and sentence for Murder, with a firearm specification. Lawrence contends that his trial counsel was ineffective for having failed to request limiting instructions concerning evidence of his prior bad acts that was admitted during the trial; that his conviction is against the manifest weight of the evidence; that his trial counsel was ineffective in cross-examining one witness by having failed to make it clear that an eyewitness, whom the witness, a police officer, had interviewed, did not actually see Lawrence shoot the victim, but instead inferred, from what she saw, that Lawrence shot the victim; that there was prosecutorial misconduct justifying reversal; that defense counsel was ineffective for having failed to object to that misconduct; that the trial court erred in overruling defense counsel's objections to leading questions; and that the trial court erred by admitting in evidence, over objection, a gun, which was not the murder weapon, and a photograph of that gun.
We conclude that Lawrence's trial counsel's failure to seek a limiting instruction concerning evidence of his prior bad acts does not rise to the level of constitutionally ineffective assistance of counsel; that Lawrence's conviction is not against the manifest weight of the evidence; that defense counsel was not ineffective in his cross-examination of the police officer who interviewed the eyewitness; that the alleged instances of prosecutorial misconduct are either unwarranted, or are not of such magnitude that defense counsel's failure to object constituted constitutionally ineffective assistance of counsel; that some of the allegedly leading questions propounded by the State were not leading, and the overruling of defense counsel's objections to questions that were leading was not sufficiently prejudicial to warrant reversal; and that the trial court did not err in admitting the gun and its photograph in evidence. Accordingly, the judgment of the trial court is Affirmed.
 I
On the morning of October 24, 2000, some time before 8:00 a.m., Taquita Young opened the back door of her house, heard gunshots, and saw a man running around the corner of her house, with his right arm extended. Young did not see the man's face, but nevertheless recognized him as Lawrence, known to her as "P.J.," who lived directly across from her in the next house. In addition to recognizing Lawrence's physical characteristics, Young noted that he was wearing a black jogging suit that she often saw Lawrence wearing.
Almost simultaneously, Young heard a knocking at her front door, cries for help, and more gunshots. Young went to her front window, and looked through the blinds. She saw Antonne Pollard, known to her as "Tonne," in the grassy area between her building and the next building. Tonne quickly disappeared from her view.
Meanwhile, Christopher Lacy was asleep in his bedroom when he also heard gunshots. He then heard a male voice screaming, "help, help, help," at his back door. As Lacy approached the back door, it flew open, and Pollard, whom Lacy had never seen before, was standing outside. Lacy saw that Pollard had been shot in the chest, and directed him to the living room couch.
Lacy left Pollard in the house, and went two doors down to his aunt, Milan Jackson. Jackson had already called 9-1-1, because she, also, had heard gunshots and cries for help. Jackson went with Lacy back to Lacy's house, to check on Pollard. Young also arrived at the house, upon learning that Pollard had been shot. Lacy asked Pollard, "who shot you?" Pollard replied, "P.J."
Young returned to her house. As she did so, she saw Lawrence, walking in her direction, and made eye contact. Lawrence had a gun in his hand. Lawrence was "just lookin' at me with the looks to kill as if — if I say somethin' I'll be next." Young recognized Lawrence, and confirmed her recognition of Lawrence as having been the person she saw earlier, running around the corner of her house.
Meanwhile, Pollard told a responding police officer that he had been shot. In response to the officer's question, Pollard identified the person who shot him as "P.J." When the officer asked Pollard, "do you know his real name besides P.J.?" Antonne shook his head "no."
Pollard died a little less than an hour later, at the hospital where he had been taken, as the result of the gunshot wound to his chest.
Lawrence was indicted for the purposeful Murder of Pollard, with a firearm specification, and also for Murder as a proximate result of his committing or attempting to commit Felonious Assault, also with a firearm specification. Following a jury trial, Lawrence was found guilty of both charges, and both firearm specifications. The trial court merged the Murder convictions into one, merged the firearm specification into one firearm specification, and sentenced Lawrence accordingly. From his conviction and sentence, Lawrence appeals.
 II
Lawrence's First Assignment of Error is as follows:
 "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL THROUGH COUNSEL'S FAILURE TO REQUEST AN `OTHER ACTS' LIMITING INSTRUCTION, AND THE COURT'S FAILURE TO PROVIDE THE JURY WITH THIS INSTRUCTION."
At trial, evidence came in implicating Lawrence in other bad acts. This evidence included the fact that he was arrested at the house he shared with Latasha Wade, for drug charges, and that a gun, illegal drugs, and scales used to weigh the drugs, were kept at the house. There was also a reference to a previous arrest (which resulted in a photograph used in a photo spread identification). No details were ever mentioned concerning the previous arrest, and it was never clearly differentiated from the subsequent arrest, although an alert juror might have been able to figure out that more than one arrest was involved. The jury was never given an instruction limiting its consideration of this evidence to proper purposes. Because Lawrence's trial counsel never requested a limiting instruction, this assignment of error is framed in terms of ineffective assistance of trial counsel.
Lawrence cites State v. Dotson (April 28, 1992), Franklin App. No. 91-AP-999, for the proposition that the failure to request a limiting instruction may constitute ineffective assistance of counsel. In that case, the evidence of the defendant's prior offense should never have been presented to the jury, and the prosecution conceded that the conviction had to be reversed, and the cause remanded, upon that ground. Although the defendant had argued, in the alternative, in that case, that his trial counsel was ineffective for having failed to request a limiting instruction, that issue became moot in view of the larger problem that the evidence ought never to have come before the jury at all, which was the basis for the appellate court's decision.
Lawrence also cites State v. Lenoir (Sept. 12, 1997), Montgomery App. No. 15469, for the proposition that ineffective assistance of counsel requires a lower showing of prejudice than a claim of plain error. We agree. We note that the holding in State v. Lenoir, supra, was, nevertheless, that defense counsel's failure to have requested a limiting instruction was not sufficiently prejudicial to require reversal.
The issue, as we understand it, is whether there is a reasonable probability that, but for trial counsel's unreasonably ineffective performance, the result of the proceeding would have been different, with a reasonable probability being defined as a probability sufficient to undermine confidence in the outcome. Strickland v. Washington (1984),466 U.S. 668; State v. Jones (Sept. 27, 1996), Clark App. No. 95-CA-0039, at 10.
The State did not present evidence in any detail concerning the charge resulting in Lawrence's arrest. Lawrence used the fact that he had been arrested for an unrelated charge, several months after having been identified by a witness as the perpetrator of this Murder, in his closing argument. He argued to the jury that the police obviously must have found his identification to be lacking in credibility, and only decided to charge him with the Murder after he had been arrested for an unrelated offense several months later.
The State brought out the presence of the gun, a bullet-proof vest, illegal drugs, and scales for weighing the drugs, in its cross-examination of Latasha Wade, the woman with whom Lawrence was living, and the mother of his child. Wade had painted a picture of Lawrence as a loving father, who was not only actively involved in the rearing of his own child, but also in the rearing of her two other children. The State, in its cross-examination of Wade, presented a contrasting picture of their home as a home where illegal drugs were kept for sale, along with a gun and a bullet-proof vest. However, no direct proof was offered of Lawrence having committed an act of drug trafficking.
In assessing whether there is a reasonable probability that the outcome of this trial would have been otherwise, had a limiting instruction been given, we must take into consideration the overall strength of the evidence against Lawrence. That evidence is discussed in Part III, below. We would characterize the evidence as neither overwhelming, as was the case in State v. Lenoir, supra, nor particularly weak. It included a witness who positively identified Lawrence as the person seen running, arms stretched out in front of him, consistently with holding a gun (although the gun was not seen), between the first and second bursts of gun fire. This witness also identified him as the person seen walking toward her, shortly after, gun in hand, and looking at her with a "look to kill." This evidence is corroborated by the decedent's dying declaration that "P.J." was the person who shot him. We recognize that the defense established at trial that there were two other persons with connections to this area who also went by the nickname "P.J."
All in all, we construe the evidence in this case to be intermediate between an overwhelming evidence case and a close case. Although we recognize the danger that a jury may draw the forbidden inference — that is, that because the defendant performed a reprehensible act on one occasion, he must have committed the act for which he is being tried — we are loath to assume that a jury would give that inference much weight in view of the instructions given the jury concerning the presumption of innocence and the burden of proof beyond reasonable doubt. In any case other than a close case, where we can easily envision a jury reaching a verdict of not guilty, we are not prepared to find that trial counsel's failure to have requested a limiting instruction concerning evidence of other bad acts creates a reasonable probability of a different outcome, at least where the other bad acts are not markedly similar to the charged offense, a prior sex offense in a sex-offense case, for example.
Lawrence's First Assignment of Error is overruled.
 III
Lawrence's Second Assignment of Error is as follows:
 "APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
In reviewing a conviction to determine whether it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
That Antonne Pollard was shot and killed on the morning of October 24, 2000, is not disputed. The sole issue is whether Lawrence was the person who shot and killed Pollard.
That Pollard identified his killer, in a dying declaration, as "P.J." was testified to by several witnesses, including two police officers. "P.J." is a nickname by which Lawrence is known. Lawrence presented evidence that there were two other individuals who had frequented the vicinity where the killing took place who also went by that nickname. One of these had been put on a trespass list, excluding him from coming on the property.
The crucial testimony linking Lawrence to the shooting was supplied by Taquita Young. Her testimony is worth setting forth in some detail:
 "A. I just open up my door. As I'm openin' up my door, I hear shots, and I see — you hafta put the thing back up for me. . . .
"Q. All right.
"A. . . . and I'll show you.
"Q. Not a problem.
 "A. I open up my back door. The way my back door opened, this part is open — [Indicating], but this part is not open yet. As I'm openin' up my door, I see someone fadin' off right here with black — a black joggin' suit on and I hear shots.
 "Q. And, uh . . . were you able to see and recognize that person then?
 "A. Uh . . . `bout this much, yeah. I didn't get — actually get to see the face, but the shoulder, the, you know, the back of the head, like no face. It's like goin' around a corner. They cut — they cuttin' around a corner so I basically see the back, the end of `em.
"Q. Did you recognize that person from what you saw?
"A. Yes.
"Q. And who did you recognize that person as?
"A. P.J.
"Q. The person you referred to over here as this . . .
"A. In the blue shirt.
 "Q. . . . man in the blue shirt? [previously identified in the record as the defendant]
"A. Yes.
 "Q. What about the person at that time that you saw, were you able to recognize and identify that person as P.J.?
"A. Yes.
 "Q. But what about him were you able to recognize and identify?
 "A. Uh . . . the black joggin' suit that he loved to wear, when I — as long as I been livin' there.
"Q. And you recognized the . . .
"A. Him.
"Q. . . . clothing that he wears then?
"A. Yeah, clothing, yes.
"Q. Okay. Anything about his posture or stance or . . .
"A. No, I mean, just — I just knowed it's him.
"Q. Pardon me?
"A. I just know it was him . . .
"Q. Okay.
 "A. . . . by me livin' across from `im for over a year, I will know it's him.
 "Q. Okay. Now, did anything else happen at or about that time?
 "A. Uh . . . yeah. They — well, I — he keep goin', someone hits my front door. They still screamin': `Help me, help me.' Uh . . . by this time I'm runnin' to this window — [Indicating]. After I hear that, I'm just peakin' outta my blind. Tonne [the victim] is in the middle of the field, the little grass that's right there.
"Q. Okay. What did you then do?
 "A. He's just wanderin' around. He — he's outta sight by this time. Uh . . . I'm just in the house, I don't have a phone to call . . .
"Q. Other than . . .
"A. . . . the police.
 "Q. . . . the — the: `Help, help,' have you heard any other noises?
"A. Shots. Gunshots.
"Q. And where were you when you heard the gunshots?
"A. I'm on my way to the window.
"Q. About how many gunshots did you hear?
"A. Uh . . .
"Q. Well, throughout . . .
"A. Four.
"Q. . . . the whole time there. We're gonna go . . .
"A. Maybe four."
Young was then called to the house where Pollard was lying on a couch, mortally wounded. Young then went to a nearby house to use a phone. Milan Jackson, the occupant of this house, had been on the phone to the police. Jackson handed the phone to Young. We pick up Young's testimony again at this point:
 "A. It's just a blank line. It's not — you don't hear a dial tone, you don't hear anything, it's just a blank line. So, uh . . . she said that they said they were on they way and she already called. So I called a couple friends that had went to school with Tonne to find out his real name.
 "So, uh . . . after that, I leave her house and I'm walkin' to my house, that's when I ran back across with . . .
"Q. How do you do that?
 "A. She was right here — [Indicating]. I live right here. I leave outta here house to go back to my house. As I'm right here, come around here, P.J. is . . .
"Q. You're just in the sidewalk?
"A. Yes, P.J. is walking from this direction.
"Q. He's back behind, or . . .
"A. He's like, right here — [Indicating] . . .
"Q. . . . he's like . . .
"A. . . . by the field to the side of Berea.
"Q. Is he on the . . .
"A. The one hundred — the even part of Berea.
"Q. Is he on the sidewalk or the grass?
"A. The sidewalk.
 "Q. And there's a little fence over there. Isn't there a gate . . .
"A. It's a . . .
"Q. . . . you call a . . .
 "A. . . . fence that separates Parkside from Kettering Field. I guess this is supposed to be the fence right here — [Indicating].
"Q. Okay.
"A. I'm assuming. Uh . . . he's . . .
 "Q. He's back here by what I'm gonna call this — the third building in . . .
"A. Yes . . .
"Q. . . . in the — the diagram?
"A. . . . third building.
"Q. All right.
 "A. He's walking towards the way I'm walking, but I'm cuttin' through here. The buildings are sorta closer, so . . .
"Q. Mmm Hmm.
 "A. I'm walking through here, he's walkin' this-a-way, we meet eye contact [sic], he's just lookin' at me with the looks to kill as if — if I say somethin' I'll be next. I just walk on in my door, still lookin' at him as he's walking towards 101 Hall.
 "Q. Is there any — any doubt in your mind that the person you saw initially at the first corner when you first looked out was P.J.?
 "A. By me runnin' into `im again, that just further confirms it.
 "Q. Is there any doubt in your mind that the person who you said gave you the — the look to kill, I think was your word . . .
"A. Yes.
"Q. . . . that that's this gentleman over here?
"A. Yes, that's . . .
"Q. P.J.?
"A. Yes, he is.
 "Q. When you say he gave you this look to kill, how close to him were you? If he's on the sidewalk and you're going in your . . .
 "A. I'm comin' around the — around my building, the other side of the building.
"Q. Sorry. Well . . .
 "A. Yeah, I think that's better, but I'm coming close, like, around. I'm closer to my door then, you know, he's coming down this-a-way. I'm coming around, he's about right here, and I was right — about right here now. He gets about right here by the time I'm in my door, to my door and he's still lookin' at me.
 "I'm, of course, still lookin' back at him lookin', like, what he gonna do `cause all at that same time he was walkin' with a gun on the side of `im.
"Q. Could you physically see the gun?
"A. Visibly, like . . .
"Q. You — you — you recognize it as a gun?
"A. Yes.
"Q. Okay.
"A. As a gun in `is hand.
"Q. Uh . . . during this time, is he staring at you?
"A. Yes, and I'm starin' back at `im.
 "Q. And he's walking down the sidewalk, he's givin' you the . . .
"A. Looks.
"Q. The look to kill, I think that's what . . .
"A. Yes.
"Q. . . . you said — said?
"A. Yes, that's what I said.
"Q. `Cause if you say anything you're next?
"A. Yes."
Thus, Taquita Young, who knew Lawrence, identified him positively as the person she saw running around the corner of her house. She later testified that she estimated his distance from her at that time as between six to eight feet. She also later testified that his arms were extended in front of him, ending around the corner where she could not see. She heard gunshots just before, and shortly after, seeing Lawrence. Not long after this, she saw Lawrence, whose face was now visible to her, gun in hand, and she was able to confirm her recognition of him as being the same person she had seen previously running around the corner of her house. She described his demeanor as "looking at her with a look to kill, as if I say somethin' I'll be next."
Lawrence did not testify in his own defense, but presented alibi testimony from Latasha Wade, the woman with whom he was then living, and by whom he had one child. She testified that he was with her when gunshots were heard. Significantly, Dayton police sergeant Gary White testified, in rebuttal, that Wade had told him and another police officer that she had left her residence, with the children, prior to the homicide incident occurring.
Lawrence also presented testimony from an assistant supervisor at Lawrence's place of employment, authenticating a time record reflecting that Lawrence had clocked in at 8:15 on the morning of the shooting. This meant that Lawrence's electronic card had been used to swipe the machine at that time that morning. The supervisor could not testify that she had seen Lawrence reporting for work that morning, and could not exclude the possibility that someone else may have used his card to swipe the machine.
Furthermore, the State presented evidence to show that Lawrence could have traveled from the place of the shooting to his place of employment, and been there by 8:15.
Although this was not a hopeless case for the defense, Young positively identified Lawrence as the person she saw, and the inference is strong that the person she saw running around the corner of her house, arms extended in front of him, just after one burst of gun fire, and just before the second burst, was the shooter. There is certainly sufficient evidence to support the conviction, and we cannot say, after having reviewed the entire record, having weighed the evidence and all reasonable inferences, and having considered the credibility of witnesses, that the jury clearly lost its way.
We conclude that Lawrence's conviction is not against the manifest weight of the evidence. Lawrence's Second Assignment of Error is overruled.
 IV
Lawrence's Third Assignment of Error is as follows:
 "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH INEFFECTIVE CROSS-EXAMINATION."
This assignment of error is based on the following portion of the cross-examination of Dayton police detective Raymond Martin:
 "Q. When you talked to, uh . . . Taquita Young, did she tell you that she saw someone shoot Antonne Pollard?
 "A. That's what she said. Then she explained that she saw, who she believed to be Phillip Lawrence chasing Antonne Pollard and she could see his hand stretched out and heard the gun shots."
From our review of the entire transcript of Taquita Young's testimony, as well as the question and answer from police detective Martin's cross-examination quoted above, it would have been clear to the jury that Taquita Young did not actually see Lawrence fire a gun, because Lawrence's outstretched arms were already around the corner of her house when she saw him running around the corner. This is consistent with detective Martin's testimony. An experienced defense attorney would realize that any attempt, in further cross-examining Martin, to drive home the point that Young did not actually see Lawrence shooting the gun might be met with Martin's statement that this was a reasonable inference to draw from what Young did say. We conclude that Lawrence's trial counsel was not ineffective for having failed to belabor this point. Even if Lawrence's counsel could be deemed to have been ineffective in this respect, we find it unlikely in the extreme that this would have affected the outcome of the trial.Lawrence's Third Assignment of Error is overruled.
 V
Lawrence's Fourth Assignment of Error is as follows:
 "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL THROUGH PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL."
This assignment of error is based upon several allegations of prosecutorial misconduct, coupled with the claim that trial counsel was ineffective for having failed to object to each act of misconduct. We will discuss each instance of alleged prosecutorial misconduct separately.
A. The Gun Under the Mattress.
The State established that Lawrence and Wade regularly slept in the same bed, and that Wade had been sleeping on a particular mattress instead of box springs for a period of time between six months and a year. The State introduced in evidence a Tech Nine handgun, as well as a photograph of the same handgun, that had been found underneath the mattress, apparently when Lawrence was arrested on an unrelated charge, several months after Pollard's killing. We have examined the handgun. It is bulky. Although we have not measured it, we would estimate it to be at least a foot long, and at least six inches wide in its widest dimension. Wade had testified that she was unaware of the existence of this gun.
In an attempt to impeach Wade's credibility, the State cross-examined Wade as follows:
 "Q. And all the times that you slept in the bed with Mr. Lawrence, you never once recognized that there was a Tech Nine handgun underneath the mattress?
"A. I don't look under my mattress.
"Q. Never felt it? Never . . .
"A. No.
"Q. . . . recognized the little bump?
"A. No.
"Q. Gun's too small?
"A. Excuse me?
"Q. Is the gun too small to raise a bump?
 "A. I don't know nothin' about a gun — that gun, so I couldn't tell you. I just know I don' check under my mattress.
 "Q. We'll have this marked eventually, but I wanna ask you, Ma'am, are you tellin' me that you slept in a bed, this gun was underneath it, and you never once knew that gun was between the mattress and box springs?
"A. That's correct."
In closing argument, the State reminded the jury of this testimony:
 "She claims to sleep in a mattress and box spring under which there's this nine-millimeter gun, and she does not know that it's there. Does she ever — and, uh . . . as Michelle asked one time, does she ever change the sheets?"
Lawrence seems to be contending that the State's cross-examination and argument concerning the presence of the gun underneath the mattress is unfair because it was never established how long the weapon had been there. The State never claimed that the gun had been there any particular length of time. In our view, it is a reasonable inference that the gun had been there for some period of time, in the absence of any testimony indicating that the gun had only been put there for a particular purpose shortly before it was discovered. We conclude, therefore, that this line of questioning and argument was not improper.
B. The Prosecutor's Statement that Identity Is Not an Issue.
In her opening argument[1] to the jury, the prosecutor, after having referred to uncontroverted facts that Antonne Pollard was shot and killed, and that the offense occurred in Montgomery County, continued as follows:
 "It is also uncontroverted, that I submit to you, that the person who killed Antonne Pollard, is the Defendant. I'll also discuss with you the element of purpose to cause the death of Ontwo — of Antonne Pollard."
After suggesting that the purpose to kill could reasonably be inferred from the fact that the shooter fired at Pollard, the prosecutor continued as follows:
 "Now, the only question that has really been raised in this case is who did it? Uh . . . what evidence do we have to establish that the Defendant committed this crime? And I submit to you that identity is not a [sic] issue in this case. And it's not a issue in this case for two reasons.
 "You heard the testimony of Taquita Young, who told you when she woke up that morning, she was getting her kids ready for school. She opened her back door and she saw the Defendant runnin' around the corner. Now, she could not see what was in his hands, but she saw his arms outstretched.
 "At the same time, she heard shots. And a few ma — moments later, she heard, uh . . . Antonne Pollard at her door screamin' for help. She heard additional shots. Moments later, we know that Antonne Pollard is found shot. That he's been shot through the chest and he was shot in the hand. We also know that Taquita Young saw the Defendant moments after that, and when she saw him he had a gun in his hand. And that he gave her a look to kill, a look that said, `you say anything and you're next.' That's circumstantial evidence that he was the person who shot Antonne Pollard.
 "Well, we na — not only have that in this case. We have Antonne Pollard, who, as he is lying there bleeding to death, tells anybody and everybody who was listenin' who shot him. P.J. shot him. He tells Chris Lacy when he comes to that apartment that P.J. shot him. He tells Taquita Young when she comes to that apartment that P.J. shot him. He tells the officers when they come to that apartment that P.J. shot him.
 "Is it a mere coincidence that the same person he say [sic] shot him is the same person that Taquita Young saw with a firearm when she heard the shots? That she saw him runnin' after Antonne Pollard? Is that a mere coincidence that's the same person that he says shot him? Ladies and gentlemen, identity is not an issue in this case."
We agree with Lawrence that the prosecutor improperly stated that identity was not an issue in the case. However, it is clear to us that she did not really mean that. It is clear from her argument that identity was the sole issue in the case, and we are convinced that it was clear to the jury that the identity of the perpetrator was the crucial issue in the case.
In the entire context of the prosecutor's argument, there is no reasonable possibility that the jury could have been misled into believing that identity was not an issue in this case. Accordingly, the prosecutor's misstatement does not constitute plain error, and defense counsel's failure to have objected to it does not constitute ineffective assistance of counsel.
C. Criticizing Defense Counsel for Attacking the Decedent's Lifestyle.
Lawrence next complains that the prosecutor unfairly attacked his trial counsel. This is based upon the following portion of prosecutor's closing argument:
 "You all were out to Dayton Metropolitan Housing in the view that we took Monday, whenever it was. I have to disagree with Mr. Nystrom. Dayton Metropolitan Housing is a system designed to give a good lifestyle to the residents, to the people in that community. There may be people there that he does not like. And he wants to categorize all people that live in that project area because of some lifestyle of somebody, and that therefore we cannot dispense justice for what happens in there.
 "He talked about the character of Mr. Antonne Pollard, whom I've gotten to know as calling him Tonne. Had some — I'm gonna say, he probably had some crack in his pockets. But that does not subtract from the importance of his life, to us or to his family. And this lawyer should not try to subtract from that because of the habit that Tonne had."
The above-quoted portion of the prosecutor's closing argument appears to have been a response to the following portion of defense counsel's closing argument:
 "But what have we heard about this community out here, a project? Ms. Burdette was talkin' about the list of people that she has on her trespass list running into the hundreds. Almost every witness that you heard said that shooting goes on nearly every other — every night, every other night. Tremendous amounts of gun activity, tremendous amounts of drug activity in this community. And obviously serious, Antonne Pollard died.
 "Antonne Pollard was in the middle of that. He had alcohol, marijuana, cocaine in his system when he died. There were not zero. He had been prohibited from being on the site. He was on the site. But that is not enough to go and point the finger at Phillip Lawrence. You've got to know that Phillip Lawrence was the person.
 "We also know that, uh . . . Mr. Pollard had a history of offenses. And every other year almost he was picking up a new one. So he'd been living in this environment for a long time. How many people had he crossed dur — during that time, I don't know. How many people had a problem with him during that time, I don't know. "In our view, the above-quoted portion of the prosecutor's closing argument was a fair rebuttal of the suggestion, inherent in defense counsel's closing argument, that the decedent's life had a diminished value. The prosecutor's comment was not an ad hominem attack on defense counsel, but was a legitimate criticism of, and response to, defense counsel's closing argument.
D. The Prosecutor's Bolstering Young's Credibility.
The two crucial witnesses in this case were Taquita Young and Latasha Wade. Young's testimony was essential to establishing Lawrence's identity as the person who shot Pollard. Wade provided alibi testimony that, if believed, would preclude Lawrence being the perpetrator. Obviously, then, the jury was going to have to weigh the credibility of these two witnesses.
The portion of the prosecutor's closing argument to which this contention refers is as follows:
 "He also wants to compare all people, I think, in that community equally. No. People in that community should be judged by their own individual worth and their own individual merit. And their own individual things that they have done. And I ask you to look at the individual things, the individual merit that the two people this attorney wanted you to look at, Ms. Young, who I've gotten to know as Tee-Tee, and LaTasha Wade, who we saw today. Weigh there.
 "Look at the scales of those two human beings and those two individuals during the course of your deliberations. And if you do that, Tee-Tee deserves to be placed on a pedestal. And I'll come — and I'm gonna explain that to you.
". . .
 "Think about it. She [Young] goes to her place, a single mother of three. Having witnessed this, having also gone over and talked to Tonne, she is basically home alone. Now she's got to decide, what does she do.
 "She, I submit, became understandably scared. Because she described the look to kill she got from this man, you talk, you're next. She's now home alone that morning, thinking. What do I do, I submit. I submit she was scared for her life, just as Tonne was scared for his life, when this man was chasing him from the corner.
". . .
 "When eventually, after shots are fired and rang out, Tee-Tee looks out of one of her windows, and I'm not sure which one, she sees, I submit, Tonne rounding the corner of the third building. So that he can then — Tonne can make entrance to save his life to get into some place that's open, and he happens to go into One Eleven, crying for help.
 "What does Taquita do? I submit, having been given the look to kill, she's not going to confront her own — [Unintelligible — Someone coughing] — that morning and go out and get in a police cruiser and sit there in public and write out a written statement, so all the neighbors can see that she's gonna be a witness. No.
 "I would also submit that she's not going to want to be interviewed at her porch. I would also submit that she's going to try to figure out what to do. Do I do the right thing or do I just not get involved? She probably contemplates that.
 "And what does she do later on that day? She calls, I think it was, uh . . . a lady Sergeant. The police lady — or the Sergeant anyway had given her a card. Later on that day, she makes a conscious decision to get involved, to do the right thing, to come downtown. And this is from the projects. And I submit that Tee-Tee deserves to be placed high on that pedestal of citizens.
 "Not citizens who permit their boyfriends to sell drugs in front of their kids from their refrigerator. She does, what I submit, the right thing, and I also submit a dangerous thing. As Detective Martin said, now four o'clock, she comes down, we know what happened. She identifies P.J. She identifies Phillip Lawrence in a photo spread as being the man with the gun. But like Detective Martin said, he didn't do a Search Warrant, because he didn't want to lose his witness.
". . .
 "You know, Tee-Tee does decide to come forward. But yet, now she's criticized. She's slippery as an eel. Well, let's talk about some of the questions on Cross Examination that were propounded to Tee-Tee.
 "You heard shots? Yes. I'm — I'm paraphrasing. She said she heard four or five. In Cross Examination, was it more like fourteen? No. Didn't you have burglary complaints about your apartment? No. Didn't you have burglary complaints against Tonne? Never, she said. Didn't you tell the police it was only — you only thought it was a gun? No, I told `em it was a gun. Didn't you tell the police officer the man was five or six or five seven? No.
 "Now, with those questions, if that's being slippery, where is there any evidence of any of those types of things that shows that Tee-Tee was misleading or lying or fabricating anything? He can ask her questions of whatever he wants to. The question itself does not make it a valid point. It's the witness's answer. And her answers have never been shown wrong. Pedestal, ladies and gentlemen, pedestal.
 "Well, I don't know — I'm not sure that trial we were in if we're — Mr. Nystrom and I are in the same Courtroom. But now she's jealous. I don't understand that. If you guys can put that one together, you're free to do so. But he claims for some reason, that Tee-Tee's jealous. I submit to you that this lady's decision to come forward back on the day this happened — and you will have the photo spread. And one of the things that maybe the Judge will tell you about is when you look at identification testimony, look at how soon after the event had occurred. This occurred the same day.
 "And I submit to you that her credibility was not shaken. Nothing she said has been proven incorrect. And that she was not as slippery as an eel, but now, she was one, being herself, and two, telling the truth."
Lawrence contends that the above-quoted passages from the prosecutor's closing argument constituted an improper bolstering of the credibility of the witness Young. In our view, the prosecutor made a reasonable argument that Young's testimony was worthy of belief.
In conclusion, of all of the claims that Lawrence has made that the prosecutor engaged in misconduct, the only instance that we conclude constitutes misconduct is the prosecutor's statements, in closing argument, that identity was not an issue in this case. As noted, however, it is clear from the rest of the prosecutor's argument that she did not really mean this, and we deem it improbable in the extreme that these comments misled the jury into thinking that the identity of the perpetrator was not an issue. Accordingly, we find no prosecutorial misconduct in this record sufficiently prejudicial to warrant reversal, and we conclude that Lawrence's trial counsel was not ineffective for having failed to object to any of the instances of alleged prosecutorial misconduct.
 VI
Lawrence's Fifth Assignment of Error is as follows:
 "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT OVERRULED DEFENSE OBJECTIONS TO THE STATE'S LEADING QUESTIONS."
In this assignment of error, Lawrence contends that the trial court erred by overruling his objections to leading questions propounded by the State on direct examination. We will consider each instance individually.
A. Asking Christopher Lacy About His Fear of Retaliation.
This contention is based upon the following re-direct examination of the witness Christopher Lacy:
 "Q. Mr. Lacy, you indicated that, uh . . . at one point you didn't come forward and why was that again?
"A. I was scared.
"Q. Okay. And, uh . . . what were you scared of?
 "A. I didn't wanna — it was a murder case, I didn't wanna show.
 "Q. Were you afraid that if you testified in this case, you'd be retaliated . . .
"MR. NYSTROM: Objection, Your Honor. She's leading.
"JUDGE MARTIN: She may ask the question.
 "BY MS. PHIPPS: Were you afraid that if you testified in this case that you'd be retaliated against, that somebody would do something to you or your family?
"A. Yes."
In cross-examination, Lawrence had established that Lacy had failed to appear at a prior hearing in this case, even though he had been subpoenaed. It was, therefore, competent for the State to inquire of Lacy why he had not appeared at the prior hearing. However, we agree with Lawrence that Lacy was asked a leading question after he had testified that he did not want to appear at the earlier hearing because it was a Murder case. Instead of being asked why he did not want to appear, he was asked whether he was afraid that if he testified, there would be retaliation against him or his family.
A leading question is one which "instructs the witness how to answer or puts into his mouth words to be echoed back." State v. D'Ambrosio (1993),67 Ohio St.3d 185, 190. In her question to Lacy, the prosecutor suggested to him the reason why he had been afraid to testify at the prior hearing. Leading questions should not be used on the direct examination of a witness except as might be necessary to develop his testimony. Evid.R. 611(C). At the stage in the questioning at which the leading question was propounded, it was premature to conclude that a leading question was necessary to develop Lacy's testimony.
Although we conclude that the trial court erred by overruling Lawrence's objection, we find it unlikely that this had any prejudicial impact on the outcome of the trial. No evidence was elicited at the trial to show that Lawrence, or any one acting on his behalf, ever did anything to put a witness in fear. Accordingly, the subject matter of this questioning, which went to the reason why Lacy had not testified at a prior hearing, is so peripheral to the issues in this case, that we conclude that the trial court's error in having overruled Lawrence's objection to the leading question is harmless.
B. Asking Taquita Young Whether Pollard Told Her Who Shot Him.
Lawrence next complains about the following question, propounded to Taquita Young during her narration of her conversation with Pollard while he was lying on a couch, mortally wounded:
 "Q. While you're there talking, does he tell you who shot `im?
"A. Yes."
In our view, this is not a leading question. It is a question that could be answered affirmatively or negatively. There is nothing in the record, at least, to indicate that the prosecutor was indicating, in her question, how Young should answer this question.
Furthermore, as the State points out, Lawrence did not object to this question, so it would be governed by the plain error standard of review, in any event. Because other witnesses testified that Pollard identified "P.J." as the person who shot him, we cannot say that the outcome of this trial would clearly have been different had this testimony not been elicited.
C. Asking Detective Martin Whether He Was Later at His Office.
Lawrence next complains about the following question, propounded to Dayton police detective Raymond Martin:
 "Q. Uh . . . at some point in time did you, uh . . . leave the scene area and then later that afternoon be at your offices?"
There was no objection to this question, and we cannot imagine an argument that this question constitutes plain error, even if it is a leading question. It was merely a foundational, or transitional, question, leading up to a conversation that Detective Martin had with Taquita Young that afternoon.
D. Asking Young Whether Lawrence Was Giving Her the "Look to Kill."
Lawrence next complains about the following questioning of Young:
 "Q. And he's walking down the sidewalk, he's givin' you the . . .
"A. Looks.
"Q. The look to kill, I think that's what . . .
"A. Yes.
"Q. . . . you said — said?
"A. Yes, that's what I said.
"Q. `Cause if you say anything you're next?
"A. Yes."
At this point, Lawrence interposed an objection, which was overruled.
This would certainly be a highly improper leading question, but for the fact that the witness had already characterized the look Lawrence gave her, without having been led:
 "A. I'm walking through here, he's walkin' this-a-way, we meet eye contact [sic], he's just lookin' at me with the looks to kill as if — if I say somethin' I'll be next. . . ."
Ordinarily, the parroting back to a witness of her prior testimony, in framing a subsequent question, does not constitute leading. The prosecutor did not suggest the answer to the question, or put words in Young's mouth, because she was merely using words that Young had already used to characterize the look that Lawrence had given her. Therefore, these were not leading questions.
 E. Asking Young Whether She Explained to the Police Detective What the Decedent Had Told Her About "P.J."
Lawrence next complains about the following questioning of Young during her direct testimony:
 "Q. Okay. Uh . . . at — at that time did you ex — explain to the detective what Tonne had said . . .
 "MR. NYSTROM: Objection, Your Honor. We're — this — this is leading constantly. He's putting words in `er mouth. We're doing this all day long.
 "MR. SLAVENS: Well, I — I disagree. I'm going to the point, Your Honor. I wanna be precise as to the point I'm tryin' to get to.
"JUDGE MARTIN: Well, we will permit some leading.
 "BY MR. SLAVENS: Did you explain to the detective what Tonne had said about P.J.?
 "A. Uh . . . I believe that I said that, too. I told `im what I seen and I also told `im what Tonne said."
In our view, the State was not leading with these questions. Young had already testified concerning what "Tonne," the decedent, had told her concerning the identity of his killer, and the State was simply asking her, in a question that could be answered either yes or no, whether she had explained that to the investigating police detective. We find nothing in this record to indicate that these questions suggested the answer to Young, or put words in her mouth. Therefore, they were not leading, and the trial court properly overruled the objection.
 F. Asking Detective Martin What He Inquired of Young During the Photo Spread Identification.
Finally, Lawrence complains about the following questioning of police detective Raymond Martin during direct examination, to which no objection was interposed:
 "Q. And, uh . . . in addition to reading her the, uh . . . — the paragraph, and we might come back to that, do you ask her if she sees the person in there that she saw that morning with the handgun?
 "A. Yes, I — one that — actually I asked the one that shot P.J.
"Q. Oh . . .
"A. Or I'm sorry, Tonne."
As noted, there was no objection to this question. Furthermore, to the extent that the State suggested to Detective Martin the answer to the question, Martin rejected the State's suggestion. Martin was asked if he had asked Young whether she recognized in the photo array the person she had seen with the hand gun. Refusing to be led, Martin clarified that he had asked Young the potentially different question whether she recognized in the photo array the person who had shot Pollard. Clearly, any tendency of the question to have led this witness failed. There was no objection to the question, and because the witness refused to be led, there was no plain error.In conclusion, we find that there was only one leading question to which an objection was made, and this is the question addressed in sub-part A, above. We conclude that because it addressed a peripheral issue, the trial court's error in having overruled the objection is harmless. The only other arguably leading questions were not the subject of objection, and by no stretch of the imagination could be deemed to constitute plain error.
Lawrence's Fifth Assignment of Error is overruled.
 VII
Lawrence's Sixth Assignment of Error is as follows:
 "APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL THROUGH THE TRIAL COURT'S IMPROPER ADMISSION OF EVIDENCE."
In this assignment of error, Lawrence contends that the trial court erred by having admitted into evidence the handgun found under the mattress that Lawrence and Wade were sleeping on, and a photograph of that gun. It was stipulated that this was not the murder weapon, and this was made clear to the jury.
Lawrence contends that the probative value of this evidence was outweighed by the danger of prejudice, resulting from an improper inference of guilt.
The State contends that this evidence was properly admitted to rebut evidence of Lawrence's character presented by the testimony of Latasha Wade. We agree with the State that Lawrence put his character in issue when he elicited evidence from Wade to the effect that he was a loving, caring father, not only to his own child, but also to Wade's two other children.
Once a criminal defendant puts his character in issue, the State may offer evidence to rebut that testimony, and on cross-examination inquiries are allowed into relevant specific instances of conduct. Evid.R. 405(A).
"A character witness may be cross-examined as to the existence of reports of particular acts, vices, or associations of the person concerning whom he has testified which are inconsistent with the reputation attributed to him by the witness — not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony. Such inconsistent testimony tends to show either that the witness is unfamiliar with the reputation concerning which he has testified, or that his standards of what constitutes good repute are unsound." State v.Elliot (1971), 25 Ohio St.2d 249, paragraph two of the syllabus, vacated in part on other grounds, Elliot v. Ohio (1972), 408 U.S. 939,92 S.Ct. 2872, 33 L.Ed.2d 761. Although the issue is close, we conclude that the trial court did not abuse its discretion by determining that the probative value of the evidence concerning the gun kept in the house, to the extent that it impeached Wade's testimony concerning Lawrence's good character, outweighs the unfair prejudice that might result from that evidence. Evid.R. 403(A). In reaching this conclusion, we are influenced by the fact that it was made clear to the jury that this gun was not the murder weapon, and that other evidence had already been presented to the jury concerning the presence of illegal drugs, and scales used to weigh drugs, in Lawrence's home. From this, the jury could reasonably infer that Lawrence was involved in the sale of illegal drugs, and the jury would, therefore, hardly be surprised to learn that Lawrence kept a gun. Although this issue is not directly raised in the appeal, we note that the evidence suggesting that Lawrence sold illegal drugs, combined with evidence that at the time of his death the decedent had illegal drugs on his person, as well as in his system, suggests a possible motive for the killing. The existence of a possible motive, or, conversely, the absence of any plausible motive, is relevant evidence for the jury's consideration.
Lawrence's Sixth Assignment of Error is overruled.
 VIII
All of Lawrence's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and YOUNG, JJ., concur.
[1] By "opening argument," we mean the first portion of the State's closing argument, before defense counsel's closing argument. We do not mean opening statement.